# IN THE SUPREME COURT OF IOWA

No. 14–0455

Filed May 27, 2016

**STATE OF IOWA,**

> Appellee,

vs.

**ISAIAH RICHARD SWEET,**

> Appellant.

---

Appeal from the Iowa District Court for Delaware County, Michael J. Shubatt, Judge.

A juvenile offender convicted of first-degree murder appeals from the district court's order sentencing him to life in prison without the possibility of parole. **DISTRICT COURT SENTENCE REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller and Denise A. Timmins, Assistant Attorneys General, and John Bernau, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider whether a juvenile who committed first-degree murder may be committed to life in prison without the possibility of parole, consistent with article I, section 17 of the Iowa Constitution. After a sentencing hearing, the district court in this case sentenced the defendant to life in prison without the possibility of parole. For the reasons expressed below, we reverse and remand the case to the district court for resentencing consistent with this opinion.

**I. Factual and Procedural Background.**

**A. Overview of the Crime.** On May 11, 2012, seventeen-year-old Isaiah Sweet shot and killed Richard and Janet Sweet. Richard and Janet had cared for Sweet since he was four years old, as his biological mother was unable to do so. Richard was Sweet's biological grandfather. Richard and Janet had been married for thirty years.

Sweet was arrested three days after the murder. After being given *Miranda* warnings, Sweet described events leading to the murders, the details of the murders themselves, and his activities in the days after the murders.

According to Sweet, Janet was dying of cancer. His grandfather, he stated, "called [him] a piece of shit every night of [his] life and every day." Sweet contended, "[Richard] constantly told [him] to just kill [himself] and fall off the earth" and "they treated [him] like shit." According to Sweet,

> [he] tried so hard to help [his] grandma with everything, but [his] grandpa made everything so hard because [he was] always stressin' [Sweet] out, would scream at [him] for no reason and [he] didn't know what to do anymore, so [he] just snapped.

Sweet described events on the day of the murders. According to Sweet, he retrieved an assault rifle he had taken from his grandparents' room and loaded the rifle with hollow-point rounds because he knew that they would do the most damage, but also because he did not want his grandparents to go through any pain. He put on earmuffs to protect his own hearing. He shot his grandfather in the head from behind because he "hate[d] him [and because he] made [Sweet's] life a living hell." He then shot his grandmother twice in the head. After he shot them, he walked over to them and kissed them, told them he was sorry, and prayed for forgiveness. Sweet stated he knew right away what he did was wrong and he wanted to take it back.

After the murders, Sweet picked up a friend, and they went back to the house. He took a sawed-off shotgun, a knife, the assault rifle, a TV, some clothes, and nine dollars from his grandparents' wallets and left the house. Sweet then left the assault rifle and shotgun with some friends and drove to Cedar Rapids where he "party hopped to like eight different apartments" and engaged in drug transactions. Sweet told police that he told a number of persons about the murders, including his former girlfriend.

The next day, May 12, Sweet attended a birthday party for a friend's sister and then drove to Iowa City to "some big ass party." After the party, the police arrested Sweet for driving with a suspended license, and the car was impounded. At the police station, Sweet told authorities his grandparents were at the Mayo Clinic. Police allowed Sweet to call his counselor, and Sweet was released to the counselor the following day. Sweet thereafter continued his drug usage and spent the evening in a tent in the woods. The next day, May 14, authorities arrested him after spotting him at a Hardee's restaurant.

**B. Initial Legal Proceedings.** The State charged Sweet with two counts of first-degree murder. Sweet pled not guilty, and his case came to trial in October 2013. At the conclusion of the State's case, Sweet reached a plea agreement with the State. Sweet agreed to plead guilty to two counts of first-degree murder. The State agreed to recommend that the sentences run concurrently. The State and Sweet agreed a sentencing hearing would occur based on Sweet's "age and the state of [the] law." Upon being informed of the plea agreement, the court engaged Sweet in a colloquy in which Sweet stated that the witnesses would truthfully testify to facts stated in the minutes of testimony. The district court accepted the guilty plea and entered an order for a presentence investigation (PSI) report to be prepared. In the order, the court noted that the basis for the request was "the Iowa Supreme Court's decisions in *Null*, *Pearson*, and *Ragland*."

**C. PSI Report.** Pursuant to the court's order, a PSI report was prepared by the department of correctional services. The PSI report outlined the facts surrounding the crimes. The juvenile arrest history in the PSI report included a curfew violation, possession of illegal drugs, possession of drug paraphernalia, possession of alcohol under eighteen, minor using tobacco, assault with intent to commit sexual abuse, and operating a vehicle without consent.

With respect to his education, the PSI report indicated Sweet had dropped out of high school in his junior year with a grade point average of 1.061. The PSI report noted Sweet claimed he was "really intelligent" but did not apply himself and was too busy with friends to worry about grades. According to Sweet, he passed three of the GED pretests. He planned to move to Pennsylvania when he turned eighteen and live with

his mother so he could attend Penn State University. The PSI report indicated he had been suspended from school on numerous occasions.

The PSI report included an extended discussion of Sweet's family dynamics. Sweet's parents, Stacy Sweet and Christopher Galli, never married but were together for about five years. Stacy reported both she and Christopher had histories of substance abuse, with Stacy admitting to cocaine addiction. After Sweet was born, Stacy gave birth to another child by Ronald Kempinski. Kempinski at one point left Stacy and took the two children, thereafter leaving Sweet with Richard; however Stacy stated she took Sweet back at some point.

Events leading up to the placement of Sweet with Richard and Janet are unclear. Sweet reported his parents' rights were terminated because he was raped by a neighbor when he was about four. Stacy maintained her parental rights were never terminated, but she could not pursue custody because she was involved in a relationship in which there was domestic violence. Stacy reported she had been physically and verbally abused by Richard and Janet when she was a child and wanted her son placed in foster care instead of with her parents. What is clear is that Sweet came to live with Richard and Janet when he was approximately four.

The PSI report further indicated that Richard and Janet moved to Iowa when Sweet was seven to attend to Richard's mother who was in poor health. Richard and Janet did not allow Sweet to talk to his mother until he became a teenager, when Stacy gave him a cell phone. When Stacy moved back to Iowa in 2010, the family fought constantly. Sweet wanted to live with her but Richard and Janet would not allow it. Stacy moved back to Pennsylvania in 2012.

The family dynamics between Richard, Janet, and Sweet were tumultuous, with frequent arguments and screaming. Sweet reported he was diagnosed with Attention Deficit Disorder (ADD) at the age of four. Counseling was sought from Families, Inc. in early 2011, which was unsuccessful. Sweet reported the family therapist recommended inpatient committal for drug abuse, which occurred, followed by outpatient support from the ABBE Center in Manchester. At the ABBE Center, Sweet was diagnosed with Attention Deficit Hyperactivity Disorder and Conduct Disorder. The therapist characterized Sweet's insight and judgment as "limited" and noted he "may be experiencing symptoms of mania and [the] diagnosis may be Bipolar Disorder, as evidenced by [the] impulsive behaviors displayed and [the] behavior with risk for consequences."

Sweet was first referred to Juvenile Court Services (JCS) in March 2011 and again in December 2011. His cooperation with JCS was inconsistent. After being accused of a sexual assault in April 2012, he again met with JCS. On their way home from the meeting, Sweet jumped from his grandparents' moving vehicle.

Regarding his emotional and personal health, the PSI report indicated Sweet reported he had attempted suicide several times in the past, with the most recent attempt being in the tent just prior to his arrest for the murder of his grandparents.

The PSI report noted that Richard had legal difficulties with Stacy and his other daughter, Alysia, arising from the distribution of assets from his mother's estate. The dispute led to Richard's arrest on a theft charge and the loss of his job as a result of the arrest. Stacy reported Richard took his anger at his two daughters out on Sweet and was abusive towards Sweet.

The PSI report also provided information regarding drug abuse in the Sweet household. Richard's daughter told therapists that Richard was an alcoholic, while Sweet indicated he sold Adderall to Richard. Beginning at age fourteen, Sweet began using marijuana. At the time of his arrest, he was using marijuana daily. He also abused "all kinds of pain killers and prescription drugs" but denied use of methamphetamine or needle-injected substances. His grandparents had Sweet committed because of suspected drug abuse in July 2011. Sweet also began using alcohol at age fifteen and engaged in binge drinking from time to time. Sweet, however, denied having an alcohol or drug abuse problem.

Lastly, the PSI report contained information about risk-taking behavior. Sweet told a psychiatrist that he enjoyed reckless activities with friends, such as doing a back flip off a bridge into shallow water or playing games that involved dropping burning cigarettes between two friends' arms. Sweet also recalled drinking to excess and having a friend burn him fifteen times with cigarettes.

**D. Sentencing Hearing.** A sentencing hearing occurred on February 26, 2014. The court was provided with the PSI report, which was admitted into evidence without objection and without correction or elaboration by either party. The court also admitted Sweet's juvenile records, a video recording of an interview with Sweet following the murders, a transcript of that interview, a transcript of the State's case in chief in the murder trial prior to the plea agreement, and photographs of the crime scene and the weapon used to commit the crime.

The court heard victim impact statements from Matthew Camlin, the son of Janet and stepson of Richard; Amanda Sichra, Jane and Richard's granddaughter; and Angie Camlin, daughter of Janet and stepdaughter of Richard.

The State offered the testimony of John McEnany, a juvenile court officer. McEnany generally described information gleaned from approximately ten meetings with Sweet that commenced in December 2011 after Sweet was charged with possession of drug paraphernalia. McEnany recounted a history of Sweet's unstable family life, previous counseling services that Richard and Janet had sought for Sweet's behavioral and mental health issues, and his lengthy juvenile record.

At the close of the State's evidence, the defense offered and the court heard a victim impact statement from Stacy, Sweet's mother, but also the daughter of one of the deceased, Richard. Like the victims providing impact statements in the State's case, Stacy's testimony ranged beyond the impact of the crime on her. Although Stacy testified broadly about the nature of the crime and the kind of punishment she desired, the court emphasized that it would consider the victim impact statement only to the extent it related to the impact of the crime on her and nothing else.

Sweet then offered the testimony of Dr. Stephen Hart, a highly qualified expert witness in the field of clinical psychology with a special focus on the assessment of violence, risk, and psychopathic personality disorder. Dr. Hart reviewed extensive documentation regarding Sweet and also interviewed Sweet prior to preparing his report.

Dr. Hart generally summarized advancements in the past twenty to thirty years regarding the understanding of the development of the adolescent brain. He noted it is now understood that up until the age of about twenty-five there is a period of rapid change or development in the adolescent brain. Regarding the maturation of the adolescent brain, he noted that when individuals are young they are impulsive, and as people get older, "[they] learn . . . the skills to inhibit behavior."

With respect to Sweet, Dr. Hart concluded he had severe developmental problems, serious problems related to mental health, serious problems with personal relationships, and serious problems with educational adjustment. He asserted Sweet's decision-making was destabilized by disturbed attention and also by impulsivity. Dr. Hart concluded Sweet was psychologically and socially immature (in terms of self-concept, empathy, and insight) and impetuous at least in part due to early onset, severe ADD. He testified that while Sweet was chronologically seventeen, his psychological or social maturation was somewhere around twelve, thirteen, or fourteen. Dr. Hart noted that although Sweet's actions appeared highly planned or premeditated, they were a "pretty bad plan" and not the "well executed plan of a common criminal."

Dr. Hart concluded by noting Sweet's prospects for rehabilitation were "mixed." According to Dr. Hart, there was some chance Sweet would experience a spontaneous partial or even full remission of his symptoms. However, he testified it was simply not possible to determine whether Sweet would develop a full-blown psychopathic personality disorder as an adult, and even if he did, psychologists could not say whether it would be untreatable. According to Dr. Hart, the earliest a determination could be made regarding Sweet's potential for rehabilitation was age thirty. According to Dr. Hart, "[W]e won't even be in a position to make a decision [about whether Sweet will get better or not] for many years because of his youth."

Sweet was last to testify. He expressed remorse and discussed his tumultuous relationship with his grandparents, which created "trust issues." Sweet asked the court to consider his youth and his desire to be rehabilitated when imposing its sentence.

The district court rendered its sentencing decision on March 11. After listing the *Miller/Ragland* factors, the district court sentenced Sweet to life in prison without the possibility of parole. The district court noted that Sweet was seventeen years and three months old at the time of the murder. While his maturity was debatable, the district court stressed that the crimes were premeditated. The district court felt that Dr. Hart's characterization of Sweet's possibility of rehabilitation as mixed was overly optimistic. Further, the district court found Sweet's case was the rare case in which a sentence of life without the possibility of parole was warranted, as the murders were horrific and showed utter lack of humanity. The district court concluded that Sweet was currently, and will continue to be, a threat to society and that the interests of justice and community safety outweighed mitigating factors.

## II. Standard of Review.

Our standard of review when a defendant attacks his or her sentence on constitutional grounds is de novo. *State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015); *State v. Lyle*, 854 N.W.2d 378, 382 (Iowa 2014); *State v. Ragland*, 836 N.W.2d 107, 113 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88, 94 (Iowa 2013); *State v. Null*, 836 N.W.2d 41, 48 (Iowa 2013); *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009).

## III. Discussion.

### A. Positions of the Parties.

1. *Sweet.* Sweet raises two related but distinct arguments in this appeal. First, Sweet argues the district court erred in holding that this is a rare or uncommon case for which life imprisonment without parole may be imposed on a juvenile. Citing the *Roper–Graham–Miller* trilogy, the leading United States Supreme Court cases under the Eighth Amendment, Sweet asserts his age, his immaturity and impetuousness,

his family and home environment, and his prospects for rehabilitation make a life-without-parole sentence constitutionally impermissible.[1] *See Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

Sweet does not expressly state whether he is proceeding under the cruel and unusual punishment provision of the United States Constitution or the Iowa Constitution. Along with citing the Supreme Court cases, Sweet also cites recent Iowa cases decided under the cruel and unusual punishment provision of the Iowa Constitution, article I, section 17. *See Lyle*, 854 N.W.2d at 378; *Ragland*, 836 N.W.2d at 107; *Null*, 836 N.W.2d at 41. When a party does not specifically indicate whether a claim is based under the Iowa or Federal Constitution, both the state and federal claims are preserved. *See State v. Harrington*, 805 N.W.2d 391, 393 n.3 (Iowa 2011); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). When a different standard is not presented under the Iowa Constitution, however, we apply the federal framework, reserving the right to apply that framework in a fashion different from federal precedents. *See State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011).

Next, Sweet contends life without the possibility of parole should be categorically banned for juvenile offenders under the Iowa Constitution. He argues the rationale of *Graham*, namely, that it is

---

[1]Sweet suggests the standard of review on his *Miller*-type claim is abuse of discretion. This is incorrect. Review of *Miller*-type constitutional claims is de novo. *See, e.g., Seats*, 865 N.W.2d at 553 (explaining various standards for challenges to sentences, including de novo review for constitutional claims).

impossible to determine the future behavior of juvenile offenders, supports a categorical ban on life without the possibility of parole in homicide cases. He notes the United States is the only country in the world that imposes life-without-the-possibility-of-parole sentences on juveniles, *see* Scott R. Hechinger, *Juvenile Life Without Parole: An Antidote to Congress's One-Way Criminal Law Ratchet*, 35 N.Y.U. Rev. L. & Soc. Change 408, 411 (2011), and the abandonment of such sentences has been supported by professional organizations such as the American Bar Association, the American Psychological Association, the American Psychiatric Association, and the National Association of Social Workers. *See* Brief for Am. Bar Ass'n as Amicus Curiae Supporting Petitioners, *Miller*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (Nos. 10–9647, 10–9646), 2012 WL 166269 [hereinafter ABA Brief]; Brief for Am. Psychological Ass'n et al. as Amici Curiae in Supporting Petitioners, *Miller*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (Nos. 10–9646, 10–9647), 2012 WL 174239 [hereinafter APA Brief].

The United States Supreme Court left this issue open in *Miller*. Although Sweet mentions the Eighth Amendment to the United States Constitution in passing, he does not expressly ground his claim on the Eighth Amendment in his brief. Sweet explicitly brings his claim under the Iowa Constitution. Because we decide this case on other grounds, we need not consider whether Sweet waived any categorical challenge under the United States Constitution.

2. *The State.* The State asserts the district court did not abuse its discretion, as it appropriately analyzed the *Miller* factors. The State contends Sweet murdered his grandparents in cold blood and that he is an "uncommon" juvenile offender who warrants a sentence of life without the possibility of parole. The State notes the murders were premeditated

and were heinous in nature.  According to the State, nothing in Sweet's background, including his chronological age, his family and home environment, or the incompetencies of youth, support a lesser sentence than life without the possibility of parole.  With respect to rehabilitation, the State argues there was no evidence the defendant can ever be rehabilitated.  The State further argues that the Iowa and the United States Constitutions permit the sentence of life without the possibility of parole for some juvenile murderers.

The State further rejects the notion that this court should adopt a categorical approach to life without the possibility of parole for juvenile offenders.  According to the State, our cases since *Miller—Null, Ragland, Pearson,* and *Lyle*—have all embraced the notion of individualized hearings to determine whether a life-in-prison sentence meets constitutional muster.  The State emphasizes that in *Miller* the United States Supreme Court did not embrace a categorical approach banning life-in-prison sentences for juveniles.  The State rejects the reliance on the fact that the United States is an international outlier, asserting that American law must be based on American values.

**B.  United States Supreme Court Precedents.**

1. *Introduction.*  We begin our consideration of the issues with a review of United States Supreme Court precedents under the Cruel and Unusual Punishment Clause of the Eighth Amendment.  In *Weems v. United States*, the Supreme Court held that a twelve-year jail term in irons at hard labor for the crime of falsifying records was excessive, emphasizing "that it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." 217 U.S. 349, 367, 30 S. Ct. 544, 549, 54 L. Ed. 793, 798 (1910).  Later, in *Trop v. Dulles*, the Supreme Court emphasized that the Eighth Amendment

"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630, 642 (1958). The teachings of *Weems* and *Trop*, namely that the Eighth Amendment embraces a proportionality principle that draws meaning from "the evolving standards of decency," have been repeatedly cited in more recent cruel and unusual punishment cases of the United States Supreme Court. *See, e.g., Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718, 742, 193 L. Ed. 2d 599, 629 (2016) (Scalia, J., dissenting); *Hall v. Florida*, 572 U.S. ___, 134 S. Ct. 1986, 1992, 188 L. Ed. 2d 1007, 1016 (2014); *Miller*, 567 U.S. at ___, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417; *Graham,* 560 U.S. at 58–59, 130 S. Ct. at 2021, 176 L. Ed. 2d at 835; *Kennedy v. Louisiana*, 554 U.S. 407, 419, 128 S. Ct. 2641, 2649, 171 L. Ed. 2d 525, 538 (2008); *Roper*, 543 U.S. at 560–61, 125 S. Ct. at 1190, 161 L. Ed. 2d at 16; *Atkins v. Virginia*, 536 U.S. 304, 311–12, 122 S. Ct. 2242, 2247, 153 L. Ed. 2d 335, 344 (2002).

2. *Developing caselaw regarding the death penalty and vulnerable classes.* Beginning in the 1970s, the Supreme Court began to consider whether the Cruel and Unusual Punishment Clause should be interpreted to categorically bar the death penalty generally or, in the alternative, with respect to certain vulnerable classes of people. In a series of cases, the Supreme Court considered the merits of broad categorical prohibitions as compared to more precise case-by-case adjudications where, at least in theory, the law's most severe punishment was reserved for the most culpable or most deserving. While this case deals with life in prison without parole rather than the death penalty, the death-penalty cases provide a backdrop for the Supreme Court's later consideration of the implications of the Eighth Amendment

on the sentence of life in prison without parole for juvenile offenders. In particular, the death-penalty cases show the tension between categorical rules, which prohibit imposition of the death penalty for certain classes or cases, and a more finely tuned case-by-case approach, which seeks to identify the most culpable of offenders who might be deserving of severe punishment.

The Supreme Court considered the constitutionality of the death penalty in murder and rape cases in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (per curiam) (plurality opinion). In *Furman*, a 5–4 majority of a highly fractured Supreme Court held that the imposition of the death penalty in the cases before the court would constitute cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 239–40, 92 S. Ct. at 2727, 33 L. Ed. 2d at 350.

The crucial opinion in *Furman* was provided by Justice Stewart, who declined to reach the question of whether the death penalty was categorically barred, but found the arbitrary and capricious nature of the application of the death penalty made it unconstitutional as applied in the cases before the court. *Id.* at 306, 309–10, 92 S. Ct. at 2760, 2762–63, 33 L. Ed. 2d at 388, 389–90. According to Justice Stewart, the rarity of the death penalty in cases where it might theoretically be imposed made the sentences under consideration "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Id.* at 309, 92 S. Ct. at 2762, 33 L. Ed. 2d at 389–90.

All in all, two justices in *Furman* found the death penalty categorically unconstitutional for all purposes,[2] three justices found the

---

[2]*Furman*, 408 U.S. at 305–06, 92 S. Ct. at 2760, 33 L. Ed. 2d at 387–88 (Brennan, J., concurring); *id.* at 358–59, 92 S. Ct. at 2787, 33 L. Ed. 2d at 417–18 (Marshall, J., concurring).

statutes before the court unconstitutional as applied but declined to reach the categorical question,[3] and four dissenting justices found the death penalty not subject to categorical challenge.[4]  While the categorical issue thus remained open in *Furman,* the Supreme Court majority was clearly concerned about the arbitrary nature of the imposition of the death penalty and the need to focus its application on only the most deserving offenders.

The Supreme Court next considered whether the death penalty should be categorically barred under the Cruel and Unusual Punishment Clause in *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion).  In *Gregg,* the statutory provision authorizing the death penalty bifurcated the question of guilt from penalty; the jury was instructed regarding aggravating and mitigating factors; the prosecution had to prove an aggravating factor beyond a reasonable doubt to support the death penalty; and the district court was required to complete an extensive report on the trial proceedings.  *Id.* at 163–66, 96 S. Ct. at 2920–22, 49 L. Ed. 2d at 869–70.  In addition, the statute provided detailed procedures regarding appeals of death sentences.  *Id.* at 166–68, 96 S. Ct. at 2922, 49 L. Ed. 2d at 870–71.  The statute provided that the Georgia Supreme Court would automatically review any death sentence to determine if it was imposed under the

---

[3]*Furman,* 408 U.S. at 257, 92 S. Ct. at 2735–36, 33 L. Ed. 2d at 359–60 (Douglas, J., concurring); *id.* at 309–10, 92 S. Ct. at 2762–63, 33 L. Ed. 2d at 390 (Stewart, J., concurring); *id.* at 312–13, 92 S. Ct. at 2764, 33 L. Ed. 2d at 392 (White, J., concurring).

[4]*Furman,* 408 U.S. at 375, 92 S. Ct. at 2796–97, 33 L. Ed. 2d at 428 (Burger, C.J., dissenting); *id.* at 414, 92 S. Ct. at 2816, 33 L. Ed. 2d at 450–51 (Blackmun, J., dissenting); *id.* at 461–65, 92 S. Ct. at 2840–42, 33 L. Ed. 2d at 478–80 (Powell, J., dissenting); *id.* at 468, 92 S. Ct. at 2843, 33 L. Ed. 2d at 486 (Rehnquist, J., dissenting).

influence of passion and prejudice, to determine if the evidence supported statutory aggravating circumstances, and to determine whether the sentence was disproportionate compared to sentences imposed in similar cases. *Id.* at 166–67, 96 S. Ct. at 2922, 49 L. Ed. 2d at 871.

In *Gregg*, Justice Stewart joined the four dissenters in *Furman* to uphold the Georgia death-penalty statute and the resulting convictions. *Id.* at 168–69, 96 S. Ct. at 2922–23, 49 L. Ed. 2d at 872. In an opinion joined by Justices Powell and Stevens, Justice Stewart characterized the *Furman* decision as holding that the death penalty could not be imposed "under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Id.* at 188, 96 S. Ct. at 2932, 49 L. Ed. 2d at 883. As in *Furman*, the *Gregg* Supreme Court plurality was plainly concerned with ensuring that the death penalty was focused only on the most deserving offenders. *Id.* at 183, 96 S. Ct. at 2930, 49 L. Ed. 2d at 880. Justice Stewart found that the detailed procedures in the Georgia statute rendered the death penalty constitutional in the case before the court. *Id.* at 207, 96 S. Ct. at 2941, 49 L. Ed. 2d at 893.

The same day the Supreme Court decided *Gregg*, it also handed down its decision in *Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion). In *Woodson*, the North Carolina legislature responded to concerns in *Furman* about the arbitrary and capricious nature of the application of the death penalty by enacting a statute in which the death penalty was mandatory for the crime of first-degree murder. *Id.* at 286–87, 96 S. Ct. at 2982–83, 49 L. Ed. 2d at 950–51. This amounted to categorization in reverse: instead of categorically *barring* the death penalty for those found guilty of first-degree murder,

the statute categorically *imposed* the death penalty on all found guilty of the crime. *Id.*

In a plurality opinion by Justice Stewart, the Supreme Court found the reverse categorical North Carolina statute unconstitutional. *Id.* at 305, 96 S. Ct. at 2991–92, 49 L. Ed. 2d at 961–62. The *Woodson* plurality found the statute defective for three reasons. First, in practice the United States' evolving standards of decency reject mandatory imposition of the death penalty for all persons convicted of a particular offense as "unduly harsh and unworkably rigid." *Id.* at 292–93, 96 S. Ct. at 2985–86, 49 L. Ed. 2d at 953–54. Second, the *Woodson* plurality noted that juries had no standards to guide their exercise of power and that juries might be willing to act lawlessly to avoid the imposition of a death sentence. *Id.* at 302–03, 96 S. Ct. at 2990–91, 49 L. Ed. 2d at 959–60. Finally, the plurality emphasized that the statute failed to allow "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Id.* at 303, 96 S. Ct. at 2991, 49 L. Ed. 2d at 960–61.

Read together, the opinions in *Gregg* and *Woodson* stand for the proposition that a statutory death penalty, if appropriately structured, could survive a categorical constitutional challenge under the Eighth Amendment. The emphasis in *Woodson* on particularized, case-by-case exploration of mitigation gave rise, however, to an important development in the law, namely, the development in capital cases of a body of law related to the proper presentation of a mitigation defense. *See, e.g.,* *Lockett v. Ohio*, 438 U.S. 586, 604–05, 98 S. Ct. 2954, 2964, 57 L. Ed. 2d 973, 989–90 (1978) (plurality opinion).

It has long been recognized that those offenders facing severe penalties are often poorly represented in their underlying criminal trials.

*See Powell v. Alabama*, 287 U.S. 45, 52, 53 S. Ct. 55, 58, 77 L. Ed. 158, 162 (1932). The American Bar Association (ABA) took the lead in developing mitigation guidelines for the defense of criminal defendants facing the death penalty.

As early as 1970, the ABA developed its generally applicable *ABA Standards Relating to the Prosecution Function and the Defense Function.* In response to the evolving death-penalty jurisprudence, the ABA developed more specific guidelines relevant to representation in death-penalty cases in the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913 (2003) [hereinafter ABA Guidelines], and Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 Hofstra L. Rev. 677 (2008) [hereinafter Supplementary Guidelines].

The later Supplementary Guidelines require the assembly of a mitigation specialist to investigate potential mitigation defenses and present them to the sentencer. Supp. Guidelines, Guideline 4.1, 36 Hofstra L. Rev. at 680–81. The guidelines and supplement require, among other things, the establishment of a relationship of trust between the defense team and the accused; thorough exploration of a defendant's family and social history, including extensive interviews; the participation in the defense of a trained mitigation expert experienced in the psychological and social sciences; and the hiring of other experts to assist the defense. ABA Guidelines, Guideline 10.5, 31 Hofstra L. Rev. at 1005–06; Supp. Guidelines, Guideline 10.11, 36 Hofstra L. Rev. at 689–92. The scope and manner of investigation and the advocacy contemplated by the guidelines and supplement are at great variance from the routine sentencing practices often employed in the courts. *See*

ABA Guidelines, 31 Hofstra L. Rev. at 928 (describing the need for the guidelines due to problems with the quality of defense being "profound and pervasive" in death-penalty cases). Under the guidelines and supplement, the mass-produced, routine Model-A defense of offenders facing the death penalty was abandoned in favor of a new, highly intense individualized process that harnessed recent developments in behavioral and psychological sciences. *See* ABA Guidelines, Guideline 10.5, 31 Hofstra L. Rev. at 1005–06; Supp. Guidelines, Guideline 10.11, 36 Hofstra L. Rev. at 689–92.

Although the Supreme Court has never held that the ABA Guidelines or Supplementary Guidelines are mandatory, they have nonetheless served as a guide for determining whether counsel has been ineffective in death-penalty cases. Even though the federal standard of ineffective assistance established in *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 692–93 (1984), has often been regarded as a difficult standard to meet, the Supreme Court, citing ABA Standards and Guidelines, has found ineffective assistance in a number of death-penalty cases. *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 387–90, 125 S. Ct. 2456, 2465–67, 162 L. Ed. 2d 360, 375–77 (2005); *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S. Ct. 2527, 2536–37, 156 L. Ed. 2d 471, 486 (2003); *Williams v. Taylor,* 529 U.S. 362, 396, 120 S. Ct. 1495, 1514–15, 146 L. Ed. 2d 389, 420 (2000) (plurality opinion).

The upshot of the Supreme Court's *Gregg–Woodson* line of cases is that in states where the death penalty is authorized with an appropriately detailed statute, a highly specialized "death penalty bar" has arisen to ensure that death-penalty defendants obtain the kind of representation necessary to prevent arbitrary and capricious application

of the sanction and allow the death penalty to be imposed only on the most culpable offenders.

While the *Woodson* approach has generated a new and substantial body of law regarding the process of case-by-case determinations in death-penalty cases, the notion that the death penalty might be categorically barred in certain types of cases remained viable. In *Coker v. Georgia*, the Supreme Court considered the constitutionality of the death penalty in connection with the rape of an adult woman. 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (plurality opinion). The Supreme Court, by another 5–4 vote, took a categorical approach, finding that the death penalty could not constitutionally be imposed for the crime of rape. *Id.* at 600, 97 S. Ct. at 2870, 53 L. Ed. 2d at 994.

In a plurality opinion, Justice White surveyed the attitudes of state legislatures and sentencing juries and concluded that they weigh against the death penalty for the crime of rape. *Id.* at 593–97, 97 S. Ct. at 2866–68, 53 L. Ed. 2d at 990–92. Justice White, however, stated that the attitude of state legislatures and sentencing juries did not wholly resolve the controversy as the Constitution contemplated that the Court brings its own independent judgment to bear on the question. *Id.* at 597, 97 S. Ct. at 2868, 53 L. Ed. 2d at 992. In applying independent judgment, Justice White concluded that the death penalty for rape was categorically unconstitutional. *Id.* at 600, 97 S. Ct. at 2870, 53 L. Ed. 2d at 994. In reaching this conclusion, he noted that rape was not the equivalent of murder and yet under Georgia law, a rapist could face the death penalty while a person who deliberately murdered a victim without aggravating circumstances would escape a death sentence. *Id.* at 599–600, 97 S. Ct. at 2869–70, 53 L. Ed. 2d at 993–94.

The Supreme Court came to a similar categorical conclusion in *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (plurality opinion). In *Enmund*, the Supreme Court held that the death penalty could not constitutionally be applied to persons convicted on an aiding and abetting theory when the defendant did not kill or intend to kill the victim. *Id.* at 801, 102 S. Ct. at 3378, 73 L. Ed. 2d at 1154. As in the plurality opinion in *Coker*, the plurality canvassed objective factors, including legislative judgments and international opinion, but also noted that the Court was required to apply its independent judgment in making the ultimate determination. *Id.* at 797, 102 S. Ct. at 3376, 73 L. Ed. 2d at 1151. In rejecting the death penalty categorically when the defendant did not kill or intend to kill the victim, the *Enmunds* plurality emphasized the role of moral guilt as "critical to 'the degree of . . . criminal culpability.'" *Id.* at 800, 102 S. Ct. at 3378, 73 L. Ed. 2d at 1153 (quoting *Mullaney v. Wilbur*, 421 U.S. 684, 698, 95 S. Ct. 1881, 1889, 44 L. Ed. 2d 508, 519 (1975)).

In sum, the Supreme Court in *Furman* arguably came close to abolishing the death penalty categorically in all circumstances, but then retreated into a bifurcated approach as seen in *Gregg, Woodson, Coker*, and *Enmund*. In some cases involving certain offenses, the Supreme Court held that the death penalty was categorically barred as "excessive" for the crime and therefore contrary to the Eighth Amendment. *Enmund*, 458 U.S. at 801, 102 S. Ct. at 3378, 73 L. Ed. 2d at 1154; *Coker*, 433 U.S. at 598, 97 S. Ct. at 2869, 53 L. Ed. 2d at 993. On the other hand, for the heinous crime of murder, the Supreme Court held that death penalty is not barred in all circumstances, but instead must be applied pursuant to specific standards and procedures designed to ensure that the death penalty is not administered in an arbitrary or capricious

manner and to ensure that the harsh penalty is reserved for the most culpable offenders. *Woodson,* 428 U.S. at 303, 96 S. Ct. at 2990–91, 49 L. Ed. 2d at 960; *Gregg,* 428 U.S. at 188, 206–07, 96 S. Ct. at 2932, 2940–41, 49 L. Ed. 2d at 883, 893. The possibility of individualized consideration of moral culpability gave rise to the development by the American Bar Association of detailed and intensive standards for the representation of persons subject to the death penalty and a new era of representation in death-penalty cases.

3. *Post-*Furman *Supreme Court caselaw regarding death penalty and life in prison for juveniles and vulnerable classes.* We now turn our attention to post-*Furman* cases of the United States Supreme Court dealing with the constitutionality under the Eighth Amendment of the death penalty for juvenile offenders or vulnerable classes. The focus here is not on the nature of the crime, as in *Coker or Enmund,* but on the character or qualities of the defendant that arguably lessen the culpability of the defendant and make that defendant less deserving of harsh criminal penalties.

We begin our discussion with *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). In *Eddings,* the Supreme Court considered whether a sixteen-year-old juvenile convicted of murder could receive the death penalty. *Id.* at 105, 102 S. Ct. at 872, 71 L. Ed. 2d at 5. In *Eddings,* the trial court recognized that although Eddings had "a personality disorder," he still knew the difference between right and wrong and therefore his personality disorder could not be considered in determining his criminal responsibility. *Id.* at 109–10, 102 S. Ct. at 874, 71 L. Ed. 2d at 7–8. The trial court further held that while his family history was "useful in explaining" his offense, it did not offer an excuse. *Id.* at 110, 102 S. Ct. at 874, 71 L. Ed. 2d at 8.

In a five-member-majority opinion by Justice Powell, the Supreme Court concluded that the death penalty was not constitutionally applied to the defendant in this case. *Id.* at 117, 102 S. Ct. at 878, 71 L. Ed. 2d at 12. The Court rejected the trial court's determination that as a matter of law the mitigating factors of a difficult family history and emotional disturbance should not be considered by the jury. *Id.* at 112–15, 102 S. Ct. at 876–77, 71 L. Ed. 2d at 9–11. Further, the *Eddings* Court observed that while "[e]ven the normal 16-year-old customarily lacks the maturity of an adult," the evidence suggested that Eddings' mental and emotional development were "at a level several years below his chronological age." *Id.* at 116, 102 S. Ct. at 877, 71 L. Ed. 2d at 12. The *Eddings* Court noted that not only was the minority of the offender "a mitigating factor of great weight," the mental and emotional development of a youthful defendant must be considered as well in sentencing. *Id.* at 108, 116, 102 S. Ct. at 873, 877, 71 L. Ed. 2d at 7, 12. Consistent with *Furman*, *Gregg*, and *Woodson*, the Court emphasized that the state statutes must ensure that "the sentencing authority is given adequate information and guidance." *Id.* at 111, 102 S. Ct. at 875, 71 L. Ed. 2d at 8–9 (quoting *Gregg*, 428 U.S. at 195, 96 S. Ct. at 2935, 49 L. Ed. 2d at 887).

The Supreme Court next considered the death penalty for a fifteen-year-old offender in *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988) (plurality opinion). The defendant urged the Court to categorically conclude that the death penalty could not be applied against defendants under the age of sixteen. *Id.* at 818–19, 108 S. Ct. at 2690, 101 L. Ed. 2d at 708.

In an opinion by Justice Stevens, a plurality of the Court began by emphasizing that in many legal contexts, children are treated differently

from adults. *Id.* at 823–25, 108 S. Ct. at 2692–93, 101 L. Ed. 2d at 711–12. While the age of majority varied among the states, no state set the age lower than sixteen. *Id.* at 824, 108 S. Ct. at 2963, 101 L. Ed. 2d at 711. The plurality noted that most states did not expressly establish an age for the death penalty, but merely provided that certain juveniles could be waived into adult court. *Id.* at 826–27, 108 S. Ct. at 2694–95, 101 L. Ed. 2d at 712–14. These statutes, according to the plurality, did not focus on the question of what chronological age the line should be drawn. *Id.* at 827–29, 108 S. Ct. at 2695, 101 L. Ed. 2d at 713–14. The plurality observed that of all the persons sentenced to death, only five were less than sixteen years old at the time of the offense. *Id.* at 832–33, 108 S. Ct. at 2697, 101 L. Ed. 2d at 717. Further, the plurality noted that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. *Id.* at 835, 108 S. Ct. at 2698, 101 L. Ed. 2d at 718. Finally, the plurality found that retribution did not justify the execution of a less culpable fifteen-year-old offender and that deterrence did not justify the death penalty as teenage minds were not likely to engage in the kind of cost-benefit analysis that attaches any weight to the remote possibility of execution. *Id.* at 836–37, 108 S. Ct. at 2699–700, 101 L. Ed. 2d at 719–20. While the plurality categorically would invalidate the death penalty for all fifteen-year-old offenders, it declined to consider the invitation of the offender and various amici curiae to draw the line at eighteen. *Id.* at 838, 108 S. Ct. at 2700, 101 L. Ed. 2d at 720.

The deciding *Thompson* opinion, however, was written by Justice O'Connor who concurred in the judgment of the Court. *Id.* at 848, 108 S. Ct. at 2706, 101 L. Ed. 2d at 728 (O'Connor, J., concurring in judgment). While concurring in the judgment, Justice O'Connor did not

embrace the plurality's discussion of objective factors or proportionality. *Id.* at 848–49, 108 S. Ct. at 2706, 101 L. Ed. 2d at 728–29. She concurred in result only because the Oklahoma legislature did not directly consider whether a fifteen year old should be eligible for the death penalty. *Id.* at 857, 108 S. Ct. at 2710–11, 101 L. Ed. 2d at 734. Justice O'Connor declined to embrace a broader rule that the death penalty for fifteen year olds was always unconstitutional, but only that the Oklahoma statute as applied to fifteen year olds was invalid. *Id.* at 857–58, 108 S. Ct. at 2711, 101 L. Ed. 2d at 734.

In *Penry v. Lynaugh,* the Supreme Court considered the constitutionality of the death penalty when the accused was intellectually disabled. 492 U.S. 302, 307, 109 S. Ct. 2934, 2941, 106 L. Ed. 2d 256, 271 (1989) (plurality opinion), *abrogated by Atkins*, 536 U.S. at 307, 321, 122 S. Ct. at 2244, 2252, 153 L. Ed. 2d at 341, 350. In *Penry*, the jury did not receive an instruction that it could consider and give effect to the mental characteristics of the offender as a mitigating circumstance. *Id.* at 310–11, 109 S. Ct. at 2942–43, 106 L. Ed. 2d at 273. The jury convicted Penry of murder, and he was sentenced to death. *Id.* at 310–11, 109 S. Ct. at 2942–43, 106 L. Ed. 2d at 272–73.

Justice O'Connor wrote the main opinion for the *Penry* Court. Writing for a five-member majority, she wrote that the Texas sentencing procedure did not adequately afford the defendant with an individualized hearing. *Id.* at 328, 109 S. Ct. at 2952, 106 L. Ed. 2d at 284. Because punishment "should be directly related to the personal culpability of the defendant," the jury must be allowed to consider and give effect to the defendant's mental status. *Id.* at 327–28, 109 S. Ct. at 2951, 106 L. Ed. 2d at 284. As a result, Justice O'Connor concluded for a majority

of the Court that Penry's sentence must be reversed.  *Id.* at 328, 109 S. Ct. at 2952, 106 L. Ed. 2d at 284.

Justice O'Connor further concluded that a categorical bar could not be adopted "today."  *Id.* at 340, 109 S. Ct. at 2958, 106 L. Ed. 2d at 292.  She emphasized that Penry was found competent to stand trial and knew the difference between right and wrong.  *Id.* at 333, 109 S. Ct. at 2954–55, 106 L. Ed. 2d at 288.  Further, Justice O'Connor, relying largely on the fact that only two legislatures had barred the death penalty for intellectually disabled offenders, found there was no objective evidence of an emerging national consensus in support of a categorical ban.  *Id.* at 334–35, 109 S. Ct. at 2955, 106 L. Ed. 2d at 288–89.

Justices Brennan and Marshall dissented on this point, finding sufficient basis to support a categorical bar.  Justice Brennan wrote that in order to be classified as intellectually disabled, an individual must have "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior [which manifest] during the developmental period."  *Id.* at 344, 109 S. Ct. at 2960, 106 L. Ed. 2d at 295 (Brennan, J., concurring in part and dissenting in part) (quoting Am. Ass'n on Mental Retardation, *Classification in Mental Retardation* 11 (H. Grossman ed. 1983)).  As a result, Justice Brennan saw no need for individualized determination as members of the class necessarily lack a degree of culpability.  *Id.* at 347–48, 109 S. Ct. at 2962, 106 L. Ed. 2d at 297.  Justice Brennan further doubted that the individualized consideration afforded at sentencing will ensure that only exceptional intellectually disabled individuals with near normal capabilities will be picked to receive the death penalty.  *Id.* at 346, 109 S. Ct. at 2961, 106 L. Ed. 2d at 296.  In particular, Justice Brennan feared that the heinousness of the crime would overpower any mitigation effect of

intellectual disability. *Id.* at 347, 109 S. Ct. at 2962, 106 L. Ed. 2d at 296–97. Further, Justice Brennan feared that a prosecutor could argue that an intellectually disabled offender should be more severely punished than an ordinary defender. *Id.* Because the death penalty for intellectually disabled individuals, who lack the same degree of culpability as nondisabled adult offenders, did not advance the penal goals of deterrence and retribution, Justice Brennan concluded that the death penalty should be categorically barred for such offenders. *Id.* at 348–49, 109 S. Ct. at 2962–63, 106 L. Ed. 2d at 297–98.

Justice Stevens filed a short concurring and dissenting opinion. He concluded, based upon the medical facts, that executions of the intellectually disabled are unconstitutional notwithstanding Justice O'Connor's analysis of objective indicators showing a lack of national consensus. *Id.* at 350, 109 S. Ct. at 2963, 106 L. Ed. 2d at 298–99 (Stevens, J., concurring in part and dissenting in part).

The Supreme Court decided *Sanford v. Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989) (plurality opinion), *abrogated by Roper*, 543 U.S. at 574, 125 S. Ct. at 1198, 161 L. Ed. 2d at 25, on the same day it decided *Penry.* In *Sanford,* the Court considered the imposition of the death penalty on two youths aged sixteen and seventeen respectively. *Id.* at 364–65, 109 S. Ct. at 2972, 106 L. Ed. 2d at 315. Justice Scalia delivered the opinion for the Court. Justice Scalia found that a majority of jurisdictions whose laws allowed capital punishment still permitted execution of sixteen and seventeen year olds and that, as a result, the offenders had not demonstrated a national consensus against the death penalty. *Id.* at 372–73, 109 S. Ct. at 2976–77, 106 L. Ed. 2d at 320. While noting that the death penalty in fact was rarely imposed upon juveniles, Justice Scalia regarded it as

"overwhelmingly probable" that this was a result of prosecutors and juries exercising discretion to ensure that the death penalty is rarely imposed upon juvenile defendants. *Id.* at 374, 109 S. Ct. at 2977, 106 L. Ed. 2d at 321.

Speaking for four members of the Court, Justice Scalia went on to indicate that the fact that youth were treated differently for purposes of driving, drinking alcohol, and voting had no impact on the constitutional analysis. *Id.* at 374–75, 109 S. Ct. at 2977–78, 106 L. Ed. 2d at 321. He also wrote that in determining a national consensus, the only relevant materials were legislative action; public opinion polls, views of interest groups, and positions adopted by various professional associations were irrelevant. *Id.* at 377, 109 S. Ct. at 2979, 106 L. Ed. 2d at 323.

On balance, *Eddings*, *Thompson*, *Penry*, and *Sanford* demonstrate that the Supreme Court in the immediate aftermath of *Furman* was repeatedly sharply divided on issues related to the imposition of capital punishment. In the aggregate, however, the majority of the Supreme Court usually elected a demanding process with particularized showings of culpability of the individual defendant over categorical rules that would exclude certain types of defendants from receiving the death penalty. On the other hand, the Court was receptive to categorical rules relating to the type of offenses for which the death penalty might be imposed.

These cases, however, were often decided by narrow majorities or plurality opinions with majorities shifting depending upon the peculiar facts of the case. The cases reflect difficult decision-making when the Supreme Court was called upon to decide whether to adopt a "bright line" categorical approach or a "case by case" process that depended upon the provision of adequate information and an appropriate structure

to ensure that the fact finder reserved the death penalty for only truly culpable defendants.

4. *Supreme Court caselaw revisits the death penalty and explores life in prison for juveniles and vulnerable classes.* Since 2000, however, the United States Supreme Court has reconsidered the implications, under the Cruel and Unusual Punishment Clause, of the death penalty and life without the possibility of parole for juveniles or vulnerable classes in a number of cases. As will be seen below, these cases significantly departed from past precedent and embarked on a new analysis of cruel and unusual punishment issues in the context of vulnerable classes, particularly juveniles.

The first case signaling the shift is *Atkins.* In *Atkins,* the Supreme Court revisited the question of whether intellectually disabled persons may be sentenced to death. 536 U.S. at 306–07, 122 S. Ct. at 2242, 153 L. Ed. 2d at 341. The Supreme Court had considered the same issue only thirteen years before in *Penry,* 492 U.S. at 302, 109 S. Ct. at 2934, 106 L. Ed. 2d at 256.

In *Atkins,* however, the Supreme Court reversed course, overruled *Penry,* and held that imposition of the death penalty on intellectually disabled persons violated the Eighth Amendment. *Atkins,* 536 U.S. at 321, 122 S. Ct. at 2252, 153 L. Ed.2d at 350. In an opinion written by Justice Stevens, the Court in *Atkins* emphasized that "the American public, legislators, scholars, and judges" had deliberated over the question of the death penalty for the intellectually disabled and had come to a consensus that it should be prohibited. *Id.* at 307, 316, 122 S. Ct. at 2244, 2249, 153 L. Ed. 2d at 341, 347. Justice Stevens noted that while a number of states still imposed the death penalty on intellectually disabled individuals convicted of heinous crimes, the

consistency of the direction of change is more important than simply tallying the number. *Id.* at 315, 122 S. Ct. at 2249, 153 L. Ed. 2d at 346–47. Justice Stevens noted further that the practice of executing the intellectually disabled was "uncommon." *Id.* at 316, 122 S. Ct. at 2249, 153 L. Ed. 2d at 347. In any event, Justice Stevens emphasized that objective evidence of consensus, though important, did not "wholly determine" the controversy as the Court was required to bring its own judgment to bear by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators. *Id.* at 312–13, 122 S. Ct. at 2247–48, 153 L. Ed. 2d at 345.

Justice Stevens wrote that for the intellectually disabled, the case for retribution was diminished. *Id.* at 319, 122 S. Ct. at 2251, 153 L. Ed. 2d at 349. Further, deterrence is also undermined by the diminished ability of the intellectually disabled "to understand and process information, to learn from experience, to engage in logical reasoning, [and] to control impulses." *Id.* at 320, 122 S. Ct. at 2251, 153 L. Ed. 2d at 349.

Justice Stevens also noted that if left to case-by-case determinations, there was "[t]he risk 'that the death penalty [would] be imposed in spite of factors which may call for a less severe penalty.'" *Id.* at 320, 122 S. Ct. at 2251, 153 L. Ed. 2d at 350 (quoting *Lockett*, 438 U.S. at 605, 98 S. Ct. at 2965, 57 L. Ed. 2d at 990). Justice Stevens further noted that intellectually disabled defendants might be less able to assist in their defense, thereby undermining the accuracy of the fact-finding process that would lead to the imposition of the death penalty. *Id.* at 320–21, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350.

The tea leaves in *Atkins* did not go unnoticed. A few years later in *Roper*, the Supreme Court departed from its narrow approach in *Eddings*

and *Thompson* and held the death penalty unconstitutional as applied to juveniles in all cases "no matter how heinous the crime." *Roper*, 543 U.S. at 568, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21.

In *Roper*, the Supreme Court cited several factors supporting its conclusion that juveniles are categorically different for purposes of imposing capital punishment. *Id.* at 569–70, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 21–22. First, the *Roper* Court noted that juveniles have a "lack of maturity and an underdeveloped sense of responsibility." *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21 (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668, 125 L. Ed. 2d 290, 306 (1993)). Second, the *Roper* Court emphasized juveniles are more susceptible than adults to "negative influences and outside pressures" and juveniles "have less control, or less experience with control, over their own environment." *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. Third, the *Roper* Court noted juvenile personality and character traits are still being formed. *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22.

In light of the differences between adults and juveniles, the *Roper* Court held that juveniles categorically cannot suffer the death penalty "no matter how heinous the crime." *Id.* at 568, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21. The *Roper* Court stressed that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.

Five years after *Roper*, the Supreme Court decided *Graham*. In *Graham*, the Supreme Court considered the constitutionality of life in prison without parole for juvenile offenders who commit nonhomicide

offenses.  560 U.S. at 52–53, 130 S. Ct. at 2017–18, 176 L. Ed. 2d at 832.  In *Graham*, the state in effect sought to uphold the life-without-the-possibility-of-parole sentence on the ground that *Roper* was a death-penalty case and "death is different" for purposes of constitutional analysis.  *See id.* at 69, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842.

As in *Roper*, however, the *Graham* Court developed a categorical rule, namely, that when nonhomicide offenses are involved, juveniles may not be sentenced to life without the possibility of parole regardless of the nature of the underlying crimes.  *Id.* at 82, 130 S. Ct. at 2034, 176 L. Ed. 2d at 850.  The *Graham* Court cited the reasoning of *Roper* and prior precedents, noting that because of the lack of maturity, a juvenile offense "is not as morally reprehensible as that of an adult."  *Id.* at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841 (quoting *Thompson*, 487 U.S. at 835, 108 S. Ct. at 2699, 101 L. Ed. 2d at 719).  Reasoning that the principles articulated in *Roper* applied fully in the context of juvenile nonhomicide offenses, the *Graham* Court categorically declared that life without the possibility of parole could never be applied to such offenses, regardless of their nature or heinousness.  *Id.* at 68, 82, 130 S. Ct. at 2026, 2034, 176 L. Ed. 2d at 841, 850.  As in *Roper*, the *Graham* Court doubted "that courts taking a case-by-case . . . approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change."  *Id.* at 77, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847.

The result in *Graham* was consistent with the position advanced by the American Medical Association (AMA) in an amicus brief with extensive citations to scientific and medical authorities.  Brief for Am. Med. Ass'n et al. as Amici Curiae Supporting Neither Party, *Graham*, 560 U.S. at 48, 130 S. Ct. at 2011, 176 L. Ed. 2d at 825 (No. 08–7412, 08–

7621), 2009 WL 2247127. The AMA noted that "[s]cientists have found that adolescents as a group, even in the later stages of adolescence, are more likely than adults to engage in risky, impulsive, and sensation-seeking behavior." *Id.* at *2. The AMA asserted that modern science demonstrated that "the structural and functional immaturities of the adolescent brain provide a biological basis for the behavioral immaturities exhibited by adolescence" and that "adolescent brains are structurally immature in areas of the brain associated with enhanced abilities of executive behavioral control." *Id.* at *4, 16.

The third case in the quartet of recent juvenile cases is *Miller.* In *Miller,* the Supreme Court considered two heinous murder cases involving juvenile defendants. 567 U.S. at ___, 132 S. Ct. at 2461–62, 183 L. Ed. 2d at 415–17. The defendants, and various amici including the ABA and the American Psychology Association (APA), urged the court to adopt the categorical approach of *Roper* and *Graham. See* ABA Brief, 2012 WL 166269; APA Brief, 2012 WL 174239.

The ABA noted that it had long been interested in matters affecting juvenile justice. ABA Brief at *2. As far back as 1980, the ABA had concluded that when compared to adults, the reduced capacity of juveniles—"in moral judgment, self-restraint and the ability to resist the influence of others, among other factors—rendered [juveniles] less morally culpable than adults." *Id.* at *7. Citing the principles enunciated by the Supreme Court in *Roper* and *Graham,* the ABA urged that the Court adopt a categorical rule barring life in prison without parole for juveniles. *Id.* at *6–7.

The ABA added two additional observations based "on its study, research and experience of its members." *Id.* at *13. First, the ABA stressed that "juveniles are less capable than adults of communicating

with and giving meaningful assistance to their counsel." *Id.* Second, the ABA observed that "juveniles convicted of murder in the United States were more likely to enter prison with a life without parole sentence than adult murder offenders." *Id.* In conclusion, the ABA stressed that it was not asserting that all juveniles should be entitled to parole, but only that they should not be denied the opportunity to be considered for parole before they die in prison. *Id.* at *23.

The brief of the APA addressed the inability of professionals to predict the course of juvenile development. APA Brief at *21. The APA brief bluntly stated that "[t]he positive predictive power of juvenile psychotherapy assessments . . . remains poor." *Id.* The APA cited a research study that found only sixteen percent of the young adolescents who scored in the top fifth on a juvenile psychopathy measurement tool would eventually be assessed as psychopathic at age twenty-four. *Id.* Another study that attempted to use psychological testing to predict future homicide offenders yielded a very high false positive rate of eighty-seven percent. *Id.* at *22. According to the APA, "those who have dedicated their careers to identifying risk factors associated with persistent criminality" acknowledge the "very imperfect predictions of which offense trajectory individuals will follow over time" and warn against the "danger that policy makers will start to use less than good predictions as a rationale for harsh punishments and severe legal sanctions." *Id.* (quoting Rolf Loeber et al., *Violence and Serious Theft: Development and Prediction from Childhood to Adulthood* 333 (2008)).

Yet, the Supreme Court in *Miller* stopped short of a categorical rule. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 ("Although we do not foreclose a sentencer's ability to make [a life-without-the-possibility-of-parole] judgment in homicide cases, we require

it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."). In *Miller*, the Supreme Court recognized the applicability of *Roper–Graham* principles to juvenile homicide offenders, noting that the differences between children and adults "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419. The *Miller* Court, like the Court in *Graham* and *Roper*, recognized the difficulty in distinguishing "between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1183, 161 L. Ed. 2d at 24).

Yet, the *Miller* Court did not reach the question of whether a categorical ban was required. *Id.* Instead, the Court reserved judgment on the categorical approach, noting ambiguously that "appropriate occasions," possibly including parole hearings and posttrial proceedings, "for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.*

Finally, the Supreme Court recently has provided further illumination of the contours of its cruel and unusual punishment jurisprudence in *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 718, 193 L. Ed. 2d at 599. In *Montgomery*, the Court considered whether the decision in *Miller* applied retroactively to cases on collateral review. *Id.* at ___, 136 S. Ct. at 725, 193 L. Ed. 2d at 610. The Court concluded that its holding in *Miller* should be given retroactive effect because *Miller* announced a substantive rule of law excluding a category of punishment from a class of offenders. *Id.* at ___, 136 S. Ct. at 736, 193 L. Ed. 2d at

622. The *Montgomery* Court stressed that *Miller* barred life in prison without the possibility of parole for "all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at ___, 136 S. Ct. at 734, 193 L. Ed. 2d at 620. The Court emphasized that *Miller* applied retroactively because it was based upon the risk that "the vast majority of juvenile offenders" face a punishment that the law cannot impose upon them, namely, life without possibility of parole. *Id.* at ___, 136 S. Ct. at 734, 193 L. Ed. 2d at 620.

The Court noted that giving retroactive effect to *Miller* did not require states to relitigate sentences "in every case where a juvenile offender received mandatory life without parole." *Id.* at ___, 136 S. Ct. at 736, 193 L. Ed. 2d at 622. Citing a Wyoming statute, the Court emphasized that a state may remedy *Miller* violations by permitting juvenile offenders to be considered for parole. *Id.* Allowing offenders to be considered for parole "ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Id.* The Court held that extending parole eligibility to juvenile offenders does not impose an onerous burden on the states. *Id.* Those persons who show an "inability to reform will continue to serve life sentences." *Id.* But, the Court emphasized, under a life-with-parole approach "[t]he opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Id.*

5. *Summary of principles of United States Supreme Court cases involving juveniles facing death or life in prison.* As is apparent, the United States Supreme Court's approach to the Eighth Amendment has evolved substantially in recent years. The Supreme Court's current

approach to the Eighth Amendment's Cruel and Unusual Punishment Clause in the context of juvenile offenders may be summarized as follows:

i. Juveniles are constitutionally different than adults for purposes of sentencing. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841; *Roper*, 543 U.S. at 569–71, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 21–22.

ii. Because of these differences, ordinary criminal culpability is diminished when the offender is a youth, and the penological objectives behind harsh sentences are diminished. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419; *Graham*, 560 U.S. at 74, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845; *Roper*, 543 U.S. at 571, 125 S. Ct. at 1196, 161 L. Ed. 2d at 22; *cf. Atkins*, 536 U.S. at 316, 122 S. Ct. at 2250, 153 L. Ed. 2d at 348.

iii. The traits of youth that diminish ordinary criminal culpability are not crime specific and are present even in juveniles who commit heinous crimes. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735–36, 193 L. Ed. 2d at 621–22; *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420.

iv. Imposition of life in prison without parole shares some of the characteristics with death sentences that are shared by no other sentences. Life without the possibility of parole is "a forfeiture that is irrevocable," depriving the convict of the most basic liberties without hope of restoration except in the remote possibility of executive clemency. Life in prison is especially harsh for juveniles, who will almost inevitably serve more years and a greater percentage of life in prison than adult offenders. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466, 183 L. Ed. 2d at

421; *Graham,* 560 U.S. at 69–70, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842.

v. The qualities that distinguish juveniles from adults do not disappear when an individual turns eighteen, but society has generally drawn the line at eighteen for the purposes of distinguishing juveniles from adults. *Graham,* 560 U.S. at 74–75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845; *Roper,* 543 U.S. at 574, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.

vi. Because the signature qualities of youth are transient, incorrigibility is inconsistent with youth. *Miller,* 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419; *Graham,* 560 U.S. at 73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844; *Roper,* 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22.

vii. While juveniles who prove irredeemably corrupt may be subject to life in prison, "appropriate occasions" for sentencing juveniles to this harshest possible penalty will be "uncommon" or "rare." *Montgomery,* 577 U.S. at ___, 136 S. Ct. at 733–34, 193 L. Ed. 2d at 619; *Miller,* 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424.

viii. Even trained and experienced professionals find it very difficult to predict which youthful offenders might ultimately fit into this small group of incorrigible offenders. *Graham,* 560 U.S. at 72–73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844; *Roper,* 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.

ix. An unacceptable likelihood exists that the brutality or cold-blooded nature of a particular crime will overcome mitigating arguments based on youth when the objective immaturity, vulnerability, and lack of true depravity should require a lesser sentence. *Graham,* 560 U.S. at

77–78, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847; *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.

x. Juveniles are less able to provide meaningful assistance to their lawyers than adults, a factor that can impact the development of the defense and gives rise to a risk of erroneous conclusions regarding juvenile culpability. *Graham*, 560 U.S. at 78, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847–48; c*f. Atkins*, 536 U.S. at 320, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350.

xi. Because of the transient characteristics of youth that diminish criminal culpability, life-without-the-possibility-of-parole sentences "pose[] too great a risk" of disproportionate punishment. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424.

xii. Accurate assessment of whether a youth is incorrigible is particularly important when a sentence of life in prison is involved, because such sentences share some of the characteristics of death sentences—characteristics that are shared by no other sentences. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2466–67, 183 L. Ed. 2d at 421–22; *Graham*, 560 U.S. at 69–70, 130 S. Ct. at 2027, 176 L. Ed. 2d at 842.

xiii. Even if the state's judgment that a juvenile offender is incorrigible is later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset. *Graham*, 560 U.S. at 73, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844–45.

xiv. Even if life in prison without the possibility of parole at the time of sentence is no longer available, nothing guarantees that a juvenile offender will be entitled to release. *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46.

**C.  Iowa Supreme Court Precedents**.

1.  *Relationship between state and federal law.*  We, of course, follow the decisions of the United States Supreme Court interpreting the Federal Constitution, and they are binding upon us on questions of federal law.  Thus, in Iowa, the United States Constitution as interpreted by the Supreme Court prevents the state from imposing life without the possibility of parole in most homicide cases involving juveniles.  If life without the possibility of parole may be imposed at all under federal law, which is unclear at this point, it may be imposed only in cases where irretrievable corruption has been demonstrated by the "rarest" of juvenile offenders.  *Montgomery,* 577 U.S. at ___, 136 S. Ct. at 734, 193 L. Ed. 2d at 620.

In any event, the rulings of the United States Supreme Court create a floor, but not a ceiling, when we are called upon to interpret parallel provisions of the Iowa Constitution.  In interpreting provisions of the Iowa Constitution, we may find federal authority persuasive, but it is certainly not binding.  In the development of our own state constitutional analysis, we may look to decisions of the United States Supreme Court, dissenting opinions of the Supreme Court, cases from other states, and other persuasive authorities.  *State v. Short*, 851 N.W.2d 474, 481 (Iowa 2014); *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

2.  *Recent Iowa caselaw utilizing* Roper–Graham–Miller *principles.*  We now turn to Iowa cases in which we considered the application of *Roper–Graham–Miller* reasoning under article I, section 17 of the Iowa Constitution.[5]  *See Seats,* 865 N.W.2d at 553–57; *Lyle,* 854 N.W.2d at

---

[5]The Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17.  The Eighth Amendment to the United States Constitution

384–86; *Ragland,* 836 N.W.2d at 113–17; *Pearson,* 836 N.W.2d at 95–97; *Null,* 836 N.W.2d at 50–51, 60–66. In these cases, we primarily embraced the reasoning in the United States Supreme Court's trilogy under the Iowa Constitution but also built upon it and extended its principles. *See Seats,* 865 N.W.2d at 553–57; *Lyle,* 854 N.W.2d at 383–84; *Ragland,* 836 N.W.2d at 113–17; *Pearson,* 836 N.W.2d at 95–98; *Null,* 836 N.W.2d at 70.

Our Iowa constitutional cases elaborate on the *Roper–Graham–Miller* trilogy in several important ways. We emphasized in *Pearson* and *Null* that immaturity, impetuosity, and poor risk assessment are to be treated as mitigating, not aggravating factors, in sentencing. *Pearson,* 836 N.W.2d at 97; *Null,* 836 N.W.2d at 75. In *Ragland, Pearson,* and *Null,* we extended the reasoning of the *Roper–Graham–Miller* trilogy to require individualized hearings in cases involving long prison sentences for juvenile defendants short of life in prison without the possibility of parole. *Ragland,* 836 N.W.2d at 122; *Pearson,* 836 N.W.2d at 97; *Null,* 836 N.W.2d at 76–77. In *Lyle,* we noted that death is no longer irreconcilably different for juveniles and extended the requirement of an individualized hearing when sentencing juveniles for lesser crimes for which the legislature has prescribed mandatory adult sentences. 854 N.W.2d at 396–98; *see also Bruegger,* 773 N.W.2d at 883–84 (applying *Roper* concepts outside the death-penalty context).

Last term we decided *Seats.* In *Seats,* we reviewed the developing jurisprudence regarding life sentences for juvenile homicide offenders. 865 N.W.2d at 553–57. As in *Miller* and our prior cases, we reserved the

---

provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

question of whether life sentences without the possibility of parole should be categorically barred. *Id.* at 558. Instead, we noted that if a life sentence without parole could ever be imposed on a juvenile offender, the burden was on the state to show that an individual offender manifested "irreparable corruption." *Id.* at 556 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424). In making such a determination, we noted that findings of such irreparable corruption should be "rare and uncommon." *Id.* at 555. We thus concluded the presumption for any sentencing judge is that a juvenile should be sentenced to life with the possibility of parole even for homicide offenses. *Id.* In considering whether the state had overcome the presumption, we observed that the district court was required to recognize that "children are constitutionally different from adults." *Id.* at 556 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418). Specifically, the district court must consider "the family and home environment that surrounds" the juvenile, including "childhood abuse, parental neglect, personal and family drug or alcohol abuse, prior exposure to violence, lack of parental supervision, lack of an adequate education, and the juvenile's susceptibility to psychological or emotional damage." *Id.* (first quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423).

In addition, the district court must consider the nature of the offense "including the extent of [the juvenile's] participation in the conduct and the way the familial and peer pressures may have affected [the juvenile]," and whether "substance abuse played a role in the juvenile's commission of the crime." *Id.* (first quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423). Finally, we stressed the district court must recognize that " '[j]uveniles are more capable of change than are adults' and that as a result, 'their actions are less likely

to be evidence of "irretrievably depraved character." ' " *Id.* (quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841). We cited *Null* for the proposition that because "incorrigibility is inconsistent with youth, care should be taken to avoid irrevocable judgment about [an offender's] place in society." *Id.* (quoting *Null*, 836 N.W.2d at 75).

3. *Summary of Iowa cases applying* Roper–Graham–Miller *principles.* Based on our recent cases, we distill the following principles:

i. We have generally accepted the principles enunciated by the United States Supreme Court in the *Roper–Graham–Miller* trilogy in our interpretation of article I, section 17 of the Iowa Constitution. *See Seats*, 865 N.W.2d at 555–57; *Null*, 836 N.W.2d at 70–76.

ii. We have regarded the constitutional holding in *Miller* as applied by this court under article I, section 17 as broadly substantive and not narrowly procedural, a view subsequently adopted by the United States Supreme Court under the Eighth Amendment in *Montgomery. See State v. Louisell*, 865 N.W.2d 590, 594 (Iowa 2015); *Ragland*, 836 N.W.2d at 114–16.

iii. Using our independent judgment under article I, section 17, we have applied the principles of the *Roper–Graham–Miller* trilogy outside the narrow factual confines of those cases, including cases involving de facto life sentences, very long sentences, and relatively short sentences. *See Lyle*, 854 N.W.2d at 402–03; *Ragland*, 836 N.W.2d at 122; *Null*, 836 N.W.2d at 71–72.

**D. Application.**

1. *Categorical rules vs. case-by-case basis.* Sweet asks us to adopt a categorical rule, namely, that juvenile offenders may never be sentenced to life without the possibility of parole. *See Graham*, 560 U.S. at 77, 139 S. Ct. 2032, 176 L. Ed. 2d at 847 (doubting "that courts

taking a case-by-case . . . approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change"); *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24 ("It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."). In our earlier cases, however, we found it unnecessary to address this larger proposition. *See Seats*, 865 N.W.2d at 558; *Ragland*, 836 N.W.2d at 122; *Null*, 836 N.W.2d at 76.

We could continue to opt for the narrower, more incremental approach, by simply addressing the question of whether the State proved in this case that Sweet is one of the "extremely rare" juveniles who is "irredeemably corrupt." Such a minimalist approach would allow for the development of additional caselaw before the larger categorical issue is confronted. Based on our experience and the caselaw developments, we think there is little to be gained by allowing further caselaw development on the question of whether a juvenile may ever receive a sentence of life without the possibility of parole.

The Supreme Court in *Roper* and its progeny has declared that for juvenile offenders the opportunity for parole can be denied, if at all, only to "irretrievably depraved"[6] or irreparably corrupt juvenile offenders. *See Roper*, 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22. The Court further narrowed the window of potential situations involving life in prison without the possibility of parole in *Montgomery*, 577 U.S. at ___,

---

[6]The phrase "irretrievably depraved" debuted in *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22, and reappeared in *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841.

136 S. Ct. at 736, 193 L. Ed.2d at 622. In light of *Miller*, as elaborated by *Montgomery*, the United States Constitution allows life without the possibility of parole for juveniles, if at all, only in "the rarest" of cases. *Id.* at ___, 136 S. Ct. at 726, 193 L. Ed. 2d at 726. Thus, the United States Supreme Court, under the Federal Constitution, has preserved life without the possibility of parole for juveniles, even those who commit heinous crime, only for a very small category of cases. And, the suggestion in *Montgomery* that the states could avoid constitutional questions by adopting statutes that do not impose life without the possibility of parole for juvenile offenders indicates that this narrow exception may be rapidly closing under federal law. *See id.* at ___, 136 S. Ct. at 736, 193 L. Ed. 2d at 622.

So, the Supreme Court has already established that except in very rare cases, life without the possibility of parole is not available under the Federal Constitution even for heinous crimes committed by juvenile offenders. The only marginal issue remaining under the Iowa Constitution is whether we should continue to reserve the possibility that a juvenile offender may be identified as "irretrievable" at the time of sentencing, or whether that determination must be made by the parole board at a later time after the offender's juvenile brain has been fully developed and a behavior pattern established by a substantial period of incarceration. If the death-penalty jurisprudence developed after *Furman* has any application to cases involving life in prison without parole, the process for making the determination of which offenders are most culpable would be resource intensive, require expert testimony, and would not be a matter left to the unguided discretion of the sentencer.

2. *Consideration of categorical approach.* In considering whether to adopt a categorical approach to the class of offenders or offenses

under the cruel and unusual punishment clause of the Iowa Constitution, we have referred to the two-step process found in the cases of the United States Supreme Court. Applying this test, we look to whether there is a consensus, or at least an emerging consensus, to guide the court's consideration of the question. Second, we exercise our independent judgment to determine whether to follow a categorical approach. *Lyle*, 854 N.W.2d at 386.

In considering the question of consensus, we note the United States Supreme Court has emphasized that its decisions impose a nationwide standard on all the states and that its decisions limit the range of options available for states in a federalist system. In considering its cruel and unusual punishment jurisprudence, the Court has emphasized this federalism consideration. *See Gregg*, 428 U.S. at 186–87, 96 S. Ct. at 2931, 49 L. Ed. 2d at 882. For us, however, these federalism concerns are entirely absent.

In any event, there is an argument that a consensus does, in fact, exist even under the standards of the United States Supreme Court. For example, an amicus brief in *Montgomery* noted that after *Miller* was decided, nine states have abolished life-without-the-possibility-of-parole sentences for juveniles, thereby establishing a clear direction toward abolition of the life-in-prison death penalty for juveniles. Brief for Charles Hamilton Houston Inst. for Race & Justice & Criminal Justice Inst. as Amici Curiae Supporting Neither Party, *Montgomery*, 577 U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (No. 14–280), 2015 WL 4624172, at *4–5 [hereinafter Charles Hamilton Houstin Brief]. Further, many of the states that do allow life in prison for juveniles do so only through statutes that allow the transfer of juveniles to adult court. *See Graham*, 560 U.S. at 67, 130 S. Ct. at 2025–26, 176 L. Ed. 2d at 840–41. The

amicus brief noted that since *Miller*, the number of juveniles actually sentenced to life without the possibility of parole has dramatically decreased—describing thirteen additional states as having functionally barred the practice. Charles Hamilton Houston Brief, at *7–10.

In addition, various professional groups urge that we categorically bar life-in-prison-without-parole sentences for juveniles. The Supreme Court has recognized the role of such groups in evaluating cruel and unusual punishment claims. *See Graham*, 560 U.S. at 68, 130 S. Ct. at 2026–27, 176 L. Ed. 2d at 841–42; *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. Finally, as noted by the ABA in its amicus brief for *Miller*, the United States is the only country in the world to impose life in prison without the possibility of parole on its juvenile offenders. ABA Brief at *24.

Yet, many states have sanctioned life in prison without parole for juvenile murder offenders. And, while one post-*Miller* state supreme court categorically barred life in prison without possibility of parole for juveniles under its state constitution, *Diatchenko v. District Attorney*, 1 N.E.3d 270, 276 (Mass. 2013), several other state supreme courts, over strong dissents, have come to the opposite conclusion. *See, e.g., Bun v. State*, 769 S.E.2d 381, 383–84 (Ga. 2015), *disapproved on other grounds by Veal v. State*, ___ S.E.2d ___, ___, 2016 WL 1085360, at *9 (Ga. Mar. 21, 2016); *Conley v. State*, 972 N.E.2d 864, 879–80 (Ind. 2012); *State v. Houston*, 353 P.3d 55, 76–77 (Utah 2015).

All this gives us pause. Yet, while we regard evidence of consensus on the general proposition that "youth are different" is not subject to dispute, we do not find a consensus today on the very narrow question before us: whether the small number of juvenile offenders convicted of murder may be sentenced *at time of trial* to life in prison without the

possibility of parole or whether such a determination must be made *at a later date* by a parole board.

The fact that we have not found a consensus, however, does not end the inquiry. Although examination of statutes, sentencing practices, professional opinion, and other sources may inform our analysis, in the end we must make an independent judgment. *See, e.g., Graham*, 560 U.S. at 61, 130 S. Ct. at 2022, 176 L. Ed. 2d at 837 ("[T]he Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution."); *Kennedy*, 554 U.S. at 421, 128 S. Ct. at 2650, 171 L. Ed. 2d at 539–40 ("Consensus is not dispositive" but the outcome "depends on the standards elaborated by controlling precedents, and on the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose."); *Roper*, 543 U.S. at 564, 125 S. Ct. at 1192, 161 L. Ed. 2d at 18 ("We then must determine, in the exercise of our own independent judgment, whether the death penalty is a disproportionate punishment for juveniles."); *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252, 153 L. Ed. 2d at 350 (independently evaluating whether death is a suitable punishment for an intellectually disabled criminal). In *Miller,* for instance, the Supreme Court did not believe a demonstration of community consensus was necessary but simply demonstrated that there was no consensus contrary to the result advanced by the Court. *Miller*, 567 U.S. at \_\_\_, 132 S. Ct. at 2471–73, 183 L. Ed. 2d at 425–29.

We find our approach in *Lyle* instructive. In that case, we made it clear that the existence or nonexistence of a consensus did not relieve this court of its duty to exercise independent judgment. *Lyle*, 854 N.W.2d at 387. In *Lyle,* we extended application of the *Roper–Graham–*

*Miller* principles to mandatory minimum adult prison terms imposed on juveniles. *Id.* at 402.

In reviewing the caselaw development, we believe, in the exercise of our independent judgment, that the enterprise of identifying which juvenile offenders are irretrievable at the time of trial is simply too speculative and likely impossible given what we now know about the timeline of brain development and related prospects for self-regulation and rehabilitation. We agree with the observation in *Graham* that the sentencing task is undertaken by trial judges "who seek with diligence and professionalism to take into account the human existence of the offender and the just demands of a wronged society." *Graham*, 560 U.S. at 77, 130 S. Ct. at 2031, 176 L. Ed. 2d at 847. But a district court at the time of trial cannot apply the *Miller* factors in any principled way to identify with assurance those very few adolescent offenders that might later be proven to be irretrievably depraved. In short, we are asking the sentencer to do the impossible, namely, to determine whether the offender is "irretrievably corrupt" at a time when even trained professionals with years of clinical experience would not attempt to make such a determination.

No structural or procedural approach, including a provision of a death-penalty-type legal defense, will cure this fundamental problem. As can be seen in the caselaw, the United States Supreme Court has struggled between categorical and case-by-case approaches involving the death-penalty and life-without-the-possibility-of-parole sentences. Generally, a case-by-case approach is only permitted in death-penalty cases when the sentencer has adequate information and the risk of an arbitrary application is minimized by substantive and procedural standards. But here, in imposing a sanction akin to the death penalty in

some respects, the trial court simply will not have adequate information and the risk of error is unacceptably high, even if we were to require an intensive, highly structured inquiry similar to that required by the ABA guidelines for the defense of death-penalty cases.

The Court's reasoning in *Roper*, foreshadowed the fallacy of the predictive enterprise later narrowly reserved in *Miller*. In *Roper*, the Court concluded the death penalty is cruel and unusual for juvenile offenders under the Eighth Amendment—without regard to the heinousness of their crimes—because an emerging consensus in neuroscience has revealed the human brain is not fully developed until the early to mid-twenties. *Roper*, 543 U.S. at 568–74, 125 S. Ct. at 1194–98, 161 L. Ed. 2d at 21–25; *see also* Laurence Steinberg, *Age of Opportunity: Lessons from the New Science of Adolescence* 71 (2014) [hereinafter Steinberg] (suggesting the brain's prefrontal cortex and the limbic system become more interconnected during the third and final phase of brain development). In the third and final phase of brain development extending into the early twenties, humans "get better at controlling their impulses, thinking about the long-term consequences of their decisions, and resisting peer pressure." Steinberg at 71. This phenomenon of brain development explains why adolescents can demonstrate intellectual promise[7] and utilize a robust vocabulary while lacking sound judgment and exhibiting poor self-regulation. Put another

---

[7]The sentencing court observed that Sweet recited his rights during an interrogation and showed signs of average to above average intelligence. The ability to recite one's rights, however, does not necessarily establish one's mature understanding of them or demonstrate maturity of judgment. Steinberg provides a reminder of this distinction by rhetorically asking, "If adolescents are so smart, why do they do such stupid things?" Steinberg at 69. The answer, Steinberg tells us, "has to do with how their brains develop." *Id.*

way, the timeline of brain development explains why smart adolescents sometimes do really stupid things. *Id.* at 69.

While not without some value, we think the fact that an offender is approaching the age of eighteen is not a very helpful factor in determining who fits the narrow group of irretrievably depraved defenders. We have noted that "the fact . . . a defendant is nearing the age of eighteen does not undermine the teachings of *Miller*." *Seats*, 865 N.W.2d at 557. The features of youth identified in *Roper* and *Graham* simply do not magically disappear at age seventeen—or eighteen for that matter. *See* Elizabeth S. Scott & Laurence Steinberg, *Rethinking Juvenile Justice* 60 (2008) ("[S]ubstantial psychological maturation takes place in middle and late adolescence and even into early adulthood."); *see also Null*, 836 N.W.2d at 55 ("[T]he human brain continues to mature into the early twenties."). While older teenagers may show greater intellectual development, that is not the same as the maturity of judgment necessary for imposing adult culpability. As Steinberg asks rhetorically, "If adolescents are so smart, why do they do such stupid things?" Steinberg at 69. We thus do not find chronological age is a reliable factor that can be applied by the district court to identify those uncommon juveniles that may merit life without the possibility of parole.

Another factor suggested in *Miller*—the offender's family and home environment—is also fraught with risks. For example, what significance should a sentencing court attach to a juvenile offender's stable home environment? Would the fact that the adolescent offender failed to benefit from a comparatively positive home environment suggest he or she is irreparable and an unlikely candidate for rehabilitation? Or conversely, would the offender's experience with a stable home environment suggest that his or her character and personality have not

been irreparably damaged and prospects for rehabilitation are therefore greater? *See Seats*, 865 N.W.2d at 561–62 (Hecht, J., concurring specially) (suggesting a sentencing court cannot predict the answers to these extremely challenging questions with reasonable certainty).

A similar quandary faces courts sentencing juvenile offenders who have experienced horrendous abuse and neglect or otherwise have been deprived of a stable home environment. Should the offenders' resulting profound character deficits and deep-seated wounds count against the prospects for rehabilitation and in favor of life-without-the-possibility-of-parole sentences under the *Miller* framework? Or should sentencing courts view the deprivation of a stable home environment as a contraindication for life without the possibility of parole because only time will tell whether maturation will come with age and treatment in a structured environment? *See Louisell*, 865 N.W.2d at 592–95 (describing an inmate with a difficult and chaotic childhood who committed first-degree murder at age seventeen but made remarkable progress toward maturity and rehabilitation during twenty-six years in prison).

Social science suggests reliable answers to these questions come only with the benefit of time and completion of brain development. Why, then, should we empower sentencing courts to make final decisions on opportunities for parole before the juvenile offenders' prospects for rehabilitation are reliably known? There is, after all, plenty of time to make such determinations later for juvenile offenders like Sweet who are sentenced to life in prison for first-degree murder.

Because of the difficulty of applying the individual *Miller* factors, the likelihood that the multifactor test can be consistently applied by our district courts is doubtful at best. The APA in *Miller* in an amicus brief emphasized that professional psychologists could not predict who was

irretrievable.  APA Brief at *21.  We should not ask our district court judges to predict future prospects for maturation and rehabilitation when highly trained professionals say such predictions are impossible.

In sum, we conclude that sentencing courts should not be required to make speculative up-front decisions on juvenile offenders' prospects for rehabilitation because they lack adequate predictive information supporting such a decision.  The parole board will be better able to discern whether the offender is irreparably corrupt after time has passed, after opportunities for maturation and rehabilitation have been provided, and after a record of success or failure in the rehabilitative process is available.  *See Seats*, 865 N.W.2d at 557 ("Even if the judge sentences the juvenile to life in prison with parole, it does not mean the parole board will release the juvenile from prison."); *see also State v. Andrews*, 329 S.W.3d 369, 379 (Mo. 2010) (Wolff, J., dissenting) (noting an offender sentenced to life with parole may nonetheless "spend the rest of his life in prison if the parole board does not determine that he is suitable for parole release").  Steinberg has poignantly made this very point:

> It's not only adolescents' immature judgment that demands that we treat them differently when they break the law.  If the plasticity of the adolescent brain makes juveniles more amenable to rehabilitation, this argues against mandatory life sentences that don't allow courts to consider whether an impulsive or impressionable teenager might grow into a law-abiding adult who can control his impulses and stand up to peer pressure.  Of course, a teenager who kills another person deliberately should be punished—no one is arguing otherwise.  But should he be incarcerated for the rest of his life, with no chance to prove that he has matured?

Steinberg at 188.  Thus, juvenile offenders' prospects for rehabilitation augur forcefully against speculative, up-front determinations of opportunities for parole and leads inexorably to the categorical

elimination of life-without-the-possibility-of-parole sentences for juvenile offenders.

For the above reasons, we adopt a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution. As a result, the sentence of the district court in this case is vacated and the matter remanded to the district court for resentencing.

Nothing in this opinion, of course, suggests that a juvenile offender is entitled to parole. The State is not required to make such a guarantee, and those who over time show irredeemable corruption will no doubt spend their lives in prison. The determination of irredeemable corruption, however, must be made when the information is available to make that determination and not at a time when the juvenile character is a work in progress.

**IV. Conclusion.**

For the above reasons, we conclude a sentence of life without the possibility of parole for a juvenile offender violates article I, section 17 of the Iowa Constitution. The sentence imposed by the district court is reversed, and the case is remanded for resentencing consistent with this opinion.

**DISTRICT COURT SENTENCE REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Cady, C.J., and Wiggins and Hecht, JJ., join this opinion. Cady, C.J., and Wiggins, J., file separate concurring opinions. Mansfield, J., files a dissenting opinion in which Waterman and Zager, JJ., join. Zager, J., files a separate dissenting opinion in which Waterman and Mansfield, JJ., join.

**CADY**, **Chief Justice (concurring specially).**

I concur in the opinion of the court. I agree the new statutory scheme adopted by our legislature for sentencing juvenile offenders convicted of first-degree murder to life without the possibility of parole violates the cruel and unusual punishment clause. *See* Iowa Const. art. I, § 17. However, I write separately to express my opinion that the statutory scheme is unconstitutional only because it does not permit the sentencing court to retain jurisdiction to reconsider a sentencing decision that denies eligibility for parole once full brain development had occurred.

The constitutional deficiencies in mandatory life-without-parole sentences for juvenile offenders first observed in *Miller v. Alabama*, 567 U.S. \_\_\_, \_\_\_, 132 S. Ct. 2455, 2471, 183 L. Ed. 2d 407, 426 (2012), are not removed when the hearing provided to overcome those deficiencies occurs long before one of the most critical characteristics of youth has unfolded to enable courts to fully assess and consider that characteristic. A constitutionally mandated hearing must be meaningful. A hearing to determine whether a juvenile offender should spend his or her entire life in prison is not meaningful as a final decision when it occurs before brain development is completed and before the court is able to best understand and assess the possibility of rehabilitation.

The problem we identify today with the current sentencing scheme was not observed when the constitutional necessity for a hearing first surfaced in *Miller*. Instead, we initially addressed the excessive nature of lengthy mandatory sentences in the context of diminished juvenile capacity. *See State v. Ragland*, 836 N.W.2d 107, 121–22 (Iowa 2013) (finding a sixty-year mandatory minimum as part of a life sentence to be

the functional equivalent of life without parole); *see also State v. Pearson,* 836 N.W.2d 88, 96 (Iowa 2013) (holding a thirty-five-year minimum ignored the diminished culpability of juveniles); *State v. Null,* 836 N.W.2d 41, 70–71 (Iowa 2013) (finding a mandatory fifty-two and a half year minimum on a term of years sentence to violate the *Miller* principles). In the process, we established the requirements for a resentencing hearing using the Supreme Court guidance from *Miller.* *See Ragland,* 836 N.W.2d at 115 & n.6. The legislature promptly responded by amending the statute to provide for a hearing and a detailed list of circumstances for the court to consider. *See* 2015 Iowa Acts ch. 65, §§ 1–2 (codified at Iowa Code § 902.1(2)–(3)). The amendment addressed the constitutional deficiency identified in *Miller* and in our cases that followed.

Yet, we now observe an inherent deficiency in the information available when sentencing juvenile offenders in the first instance. In particular, a juvenile offender who is resentenced based on evidence of rehabilitation acquired after full brain development has occurred may present a far better case for parole than an offender who has not completed brain development. *Compare State v. Louisell,* 865 N.W.2d 590, 594–95 (Iowa 2015) (describing numerous achievements accomplished over twenty-six years in prison to show she was rehabilitated at age forty six), *with Null,* 836 N.W.2d at 45–46, 76–77 (resentencing occurring at age twenty, three years into his sentence).

Judicial review tends to develop the law incrementally, and in taking this next step now, our obligation is to again apply the constitutional standard of cruel and unusual punishment to the circumstances we face. These circumstances disclose that it is cruel to sentence a youthful offender to life without the possibility of parole at a time when the juvenile has not even had the time to finish maturing.

While we strive to uphold the constitutionality of a statute when possible, we do not follow this approach by lowering our expectations for justice or accepting the imperfections we discover as an inevitable part of justice. We must embrace each discovery in each step as an opportunity to bring our law closer to our constitutional values, not find ways to avoid doing so.

It is also important to keep in mind that speculation is inevitably injected into judicial decision-making when judges are asked to make decisions before all the necessary information has accumulated. In turn, speculation only enhances the likelihood of inconsistent sentencing decisions for those who have committed the same crime. This can lead over time to patterns and outcomes that are often inconsistent with the most basic notions of justice. These outcomes need to be curtailed to better ensure fairness in our system of justice. Certainly, this fairness could not be more important when dealing with the imposition of the most severe punishment allowed by society on a child. Close enough can never be good enough.

The decision by the court today is consistent with our constitutional values and a positive step forward. It advances Iowa in an important area of the law. Yet, the parole board does not need to be the only entity standing between a juvenile offender and a lifetime of imprisonment. The entire sentencing process will best consider the interests of all in society when the final decision as to the eligibility of parole is considered by a court after all relevant information is available.

Accordingly, if a juvenile offender is to be sentenced to life without the possibility of parole the sentencing court must be given continuing jurisdiction to consider a single subsequent request by the juvenile offender for rehearing once brain development is completed. This

approach allows the juvenile offender a full and fair opportunity to show rehabilitation potential and provides the court with a more complete picture in weighing all the interests involved and determining whether the offender is "incorrigible." *See Null*, 836 N.W.2d at 63.

This approach mirrors the approach taken under the current statute that allows courts to reconsider a sentence. *See* Iowa Code § 902.4 (2015) (allowing the court to reconsider a felony sentence within the first year of conviction, excluding mandatory minimum sentences and class "A" felonies). It would give the courts the information they need for a fair evaluation and juvenile offenders the constitutional protection they deserve. Of course, it should not be overlooked that the decision of the court today also provides meaningful protection for the youth of our state.

**WIGGINS, Justice (concurring specially).**

I firmly agree with and join the majority opinion. I write separately to address points made in Justice Mansfield's dissent.

The dissent contends our decision today means the parole board will release every juvenile from prison at some point in the future. That contention is nothing more than fearmongering. The Iowa Code sets forth the standard the parole board must use in determining whether to grant a parole. Iowa Code § 906.4(1) (2015). It provides,

> A parole or work release shall be ordered only for the best interest of society and the offender, not as an award of clemency. The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.

*Id.* Not all juveniles, if any, will meet this standard. As we have previously stated,

> Even if the judge sentences the juvenile to life in prison with parole, it does not mean the parole board will release the juvenile from prison. Once the court sentences a juvenile to life in prison with the possibility of parole, the decision to release the juvenile is up to the parole board. If the parole board does not find the juvenile is a candidate for release, the juvenile may well end up serving his or her entire life in prison.

*State v. Seats,* 865 N.W.2d 545, 557 (Iowa 2015) (citation omitted).

**MANSFIELD, Justice (dissenting).**

Recognizing that our legislature and our trial courts have the primary role in determining criminal sentences, I would affirm the life-without-parole (LWOP) sentence for this seventeen year old who murdered his grandparents who had raised him.

Today, the court breaks new ground in finding that the Iowa Constitution categorically forbids such sentences. As I will explain below, I believe the justification offered by the majority for its ruling is insufficient. More is needed before we strike down a legislatively authorized sentence—especially one the general assembly reauthorized by large majorities in both houses just last year.

The facts of this case, accompanied by the district court's careful exercise of its sentencing discretion, allow the LWOP sentence in this particular case to be upheld. Regardless of my personal views on how this defendant should be sentenced, I do not believe the sentence here is *unconstitutional* because it violates the cruel and unusual punishment clause of the United States or Iowa Constitutions.

## I.  No Categorical Bar Exists to LWOP Sentences.

To save time and pages, I will not repeat what I previously said in my dissent in *State v. Seats*, 865 N.W.2d 545, 574–84 (Iowa 2015) (Mansfield, J., dissenting). In that case, I discussed why I do not believe either the United States Constitution or the Iowa Constitution categorically prohibits the legislature from authorizing LWOP sentences for juveniles who commit murder. Contrary to the court's views today, I do not believe this is a "marginal issue." It matters to offenders, victims, and communities. And it goes directly to the relationship between this court and the elected branches of government. So without restating

what I said in *Seats*, let me explain my disagreement with the majority's analysis.

**A. The United States Constitution.** In *Miller v. Alabama*, the United States Supreme Court decided that the Eighth Amendment to the United States Constitution prohibits mandatory LWOP sentences for juveniles who commit murder. 567 U.S. ___, ___, 132 S. Ct. 2455, 2469, 183 L. Ed. 2d 407, 424 (2012). However, it said that its decision "does not categorically bar a penalty . . . . [I]t mandates only that a sentence follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* at ___, 132 S. Ct. at 2471, 183 L. Ed. 2d at 426.

A few months ago, in *Montgomery v. Louisiana*, the United States Supreme Court reiterated that LWOP sentences for juveniles were still available in "rare" cases under the United States Constitution. 577 U.S. ___, ___, 136 S. Ct. 718, 733–34, 193 L. Ed. 2d 599, 619 (2016). To my knowledge, no reported decision in this nation since *Miller* has held that LWOP sentences for juvenile homicide offenders categorically violate the United States Constitution. *See Seats*, 865 N.W.2d at 574 n.10 (gathering cases). In *State v. Ragland,* we concluded unanimously that *Miller* "would seemingly permit life-without-parole sentences that are not mandated by statute if the sentencing court has the power to consider the attributes of youth in the mitigation of punishment." 836 N.W.2d 107, 115 (Iowa 2013).

Nonetheless, today the court claims that *Miller* was "ambiguous[]" as to whether it enacts a categorical bar on LWOP sentences for juvenile murderers. This is based on the court's novel reading of the following clause in *Miller*: "[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *See* 567

U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. According to my colleagues, *Miller*'s reference to "appropriate occasions" may actually be a reference to "parole hearings or posttrial proceedings." I must confess I do not follow what the majority is saying here. It seems quite clear that LWOP sentences for juvenile homicide offenders are permissible under the United States Constitution so long the standards set forth in *Miller* are complied with.

That was exactly the point of last year's legislation enacted by a vote of forty-seven to three in the Iowa Senate and eighty to eighteen in the Iowa House. *See* 2015 Iowa Acts ch. 65 (to be codified at Iowa Code § 902.1(2)–(3)). Under that law, LWOP has ceased to be mandatory for juveniles who commit first-degree murder. *Id.* However, it remains a discretionary sentencing option following a consideration of relevant factors. *Id.*

**B. The Iowa Constitution.** This leads me to the cruel and unusual punishment clause in the Iowa Constitution, which has the same wording as the Cruel and Unusual Punishment Clause in the United States Constitution. Several sources of state constitutional interpretation are relevant. For the most part, the majority either disregards or gives short shrift to them.

As I pointed out in *Seats*, Iowa constitutional history does *not* support the conclusion that an LWOP sentence for a juvenile murderer is unconstitutional regardless of the circumstances. *See Seats*, 865 N.W.2d at 575–77. Despite the length of its opinion, the court today does not discuss the Iowa historical record at all.

This silence is significant because this court has invoked our state's constitutional history in other recent state constitutional decisions. *See, e.g., State v. Young,* 863 N.W.2d 249, 277–79 (Iowa

2015); *State v. Short*, 851 N.W.2d 474, 482–85 (Iowa 2014). As was stated in *Chiodo v. Section 43.24 Panel*, "We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances." 846 N.W.2d 845, 851 (Iowa 2014) (plurality opinion).

Another relevant consideration is how other states have interpreted their own constitutions. *See Young*, 863 N.W.2d at 272 ("[I]n interpreting our state constitution, the precedents of other states can be instructive."); *City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 350–51 (Iowa 2015). Thus, post-*Miller* appellate decisions from other states should be viewed as a helpful frame of reference.

Here the trend is one-sided: All but one out-of-state appellate decisions have rejected the categorical challenge. *See Seats*, 865 N.W.2d at 577–79. Notably, appellate courts from California, Georgia, Louisiana, Indiana, Michigan, Minnesota, Pennsylvania, and Utah have all held their states' constitutions do not forbid LWOP sentences for juveniles who commit murder. *Id.* An Illinois court and a New Jersey court recently joined this list of state appellate courts that have rejected the state constitutional challenge. *See People v. Walker*, ___ N.E.3d ___, ___, 2016 WL 1670178, at *5 (Ill. App. Ct. Apr. 25, 2016) (concluding that the defendant "was sentenced at the discretion of the trial court" and his LWOP sentence "does not violate the proportionate penalties clause [in the Illinois Constitution]"); *State v. Usry*, Nos. 00–01–0166, 93–03–1078, 2016 WL 1092654, at *5 (N.J. Super. Ct. App. Div. Mar. 22, 2016) ("[D]efendants' argument that the New Jersey Constitution requires a categorical ban on life-without-parole sentences for juvenile homicide offenders is rejected."). Only Massachusetts has reached a different

result.  *See Diatchenko v. Dist. Att'y,* 1 N.E.3d 270, 276, 282–85 (Mass. 2013).

I discussed this caselaw in *Seats.*  *See* 865 N.W.2d at 577–80.  In fairness, the court does give out-of-state caselaw one paragraph of discussion today, although the court does not mention seven of the ten jurisdictions that have rejected the categorical challenge.

Yet another relevant consideration, the majority acknowledges, is whether there is a statewide or national consensus against LWOP sentences for juveniles who commit murder.  Significantly, the court concedes there is no consensus *against* this punishment.  However, the court understates the matter.  The reality is that there remains a consensus *in favor of* continuing to make LWOP sentences available for juvenile murderers.  This is exemplified by the actions of our elected representatives last year and by the similar actions of twenty-two other states that have enacted post-*Miller* legislation continuing LWOP as a sentencing option for juvenile homicide offenders.  *See Seats*, 865 N.W.2d at 572 n.8.  By contrast, only nine legislatures have made the choice since *Miller* to eliminate LWOP.  *See id.* n.6; 2016 S.D. Sess. Laws ch. 121, § 2 (to be codified at S.D. Codified Laws § 22–6–1); 2016 Utah Laws ch. 277, § 6 (to be codified at Utah Code § 76–3–209).  So consensus does not support the majority's position.

What then are the court's reasons for deciding that article I, section 17 forbids LWOP sentences for juveniles who commit murder?  There is really just one reason.  At the end of its opinion, the court says that district courts "cannot apply the *Miller* factors in any principled way to identify with assurance those very few adolescent offenders that might later be proven to be irretrievably depraved."  With part of this statement, I agree.  In truth, one cannot predict with full assurance which juvenile

offenders can and cannot be rehabilitated. The Massachusetts Supreme Judicial Court said the same thing in *Diatchenko*. *See* 1 N.E.3d at 283–84. However, for several reasons, I do not believe this rather self-evident point is enough for us to overturn the legislature's own judgment in 2015 that LWOP should remain one sentencing option in the exercise of a trial court's discretion.

First, if LWOP sentences cannot be constitutionally imposed whenever there is a possibility of rehabilitation, why is this principle limited to juveniles? Why aren't LWOP sentences categorically unconstitutional for everyone? The court acknowledges, "The features of youth . . . simply do not magically disappear at age . . . eighteen."

Second, if the *Miller* factors are "not . . . very helpful," "fraught with risks," or cannot be "consistently applied" by district courts, as the court says today, why has this court previously *expanded* their use to other contexts besides LWOP? Before today, we had embraced the *Miller–Ragland*[8] factors for sentencing juvenile offenders whenever the law provided for any mandatory minimum period of incarceration. *See State v. Lyle*, 854 N.W.2d 378, 403 (Iowa 2014) ("The youth of this state will be

---

[8]We distilled five factors from *Miller* in *Ragland*, where we said the following:

> In *Miller*, the Court described the factors that the sentencing court must consider at the hearing, including: (1) the "chronological age" of the youth and the features of youth, including "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the "family and home environment" that surrounded the youth; (3) "the circumstances of the homicide offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]"; (4) the "incompetencies associated with youth—for example, [the youth's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the youth's] incapacity to assist [the youth's] own attorneys"; and (5) "the possibility of rehabilitation."

836 N.W.2d at 115 n.6 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423).

better served when judges have been permitted to carefully consider all the circumstances of each case to craft an appropriate sentence and give each juvenile the individual sentencing attention they deserve . . . ."). Now, however, the recently mandated factors are deemed to be of "doubtful" value. Under the majority's reasoning, we should abandon any minimum periods of imprisonment and require instant parole eligibility for every juvenile who commits a serious felony.

Third, and most important, I think the inherent uncertainty regarding future prospects for rehabilitation is simply an insufficient basis for supplanting the judgment of our elected representatives and declaring our existing legislative scheme unconstitutional. I respect the view that the Iowa Constitution has zero tolerance for error, but justice is *never* perfect. Errors can be made—both in incarcerating individuals who should not be incarcerated and in releasing individuals who should not be released. And rehabilitation is not the only goal in criminal sentencing. If it were, all sentences would have no mandatory periods of incarceration.

As I noted in *Seats*, both *Miller* and our cases indicate that factors other than rehabilitation can be taken into account in sentencing juveniles. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2475, 183 L. Ed. 2d at 430 (stating that the sentencer may consider "the nature of the[] crimes," not just "age and age-related characteristics"); *Lyle*, 854 N.W.2d at 398 (stating that the sentencing may consider "the harm the offender caused"). In *Ragland*, we said "the possibility of rehabilitation" was one of *five* sentencing factors—*not the only one.* 836 N.W.2d at 115 n.6 (quoting *Miller*, 567 U.S. ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423). In *Miller*, the Supreme Court appeared to indicate that LWOP should be reserved for juvenile murderers "whose crime reflects irreparable

corruption." *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424 (quoting *Roper v. Simmons*, 543 U.S. 551, 573, 125 S. Ct. 1183, 1197, 161 L. Ed. 2d 1, 24 (2005)). It used this same formulation several times in *Montgomery*, stating that LWOP can be imposed on juvenile murderers "whose crimes reflect irreparable corruption" as opposed to "transient immaturity." 577 U.S. at ___, 136 S. Ct. at 734, 193 L. Ed. 2d at 620–21. This standard was reiterated at the very end of the case: "[P]risoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption . . . ." *Id.* at ___, 136 S. Ct. at 736, 193 L. Ed. 2d at 623. But saying that a *crime* reflects irreparable corruption is not the same thing as saying that the *offender* can never be rehabilitated. It is a broader concept that gives weight to all the *Miller–Ragland* factors.[9]

Society may want to punish a horrendous murder beyond the time necessary to rehabilitate the murderer. Parole, however, means the release of the offender occurs as soon as he or she is able and willing to be a law-abiding citizen. *Cf.* Iowa Code § 906.4(1) (2015) ("The board [of parole] shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the

---

[9]I acknowledge that one sentence in *Montgomery* focuses more narrowly on rehabilitability of the offender: "The [*Miller*] Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." 577 U.S. at ___, 136 S. Ct. at 733, 193 L. Ed. 2d at 619. I think this sentence needs to be read in the context of other, more prevalent language that is crime-based. *See id.* at ___, 136 S. Ct. at 734–36, 193 L. Ed. 2d at 619–22.

community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.").

When it enacted Senate File 448 last year, our legislature surely understood this court's basic observation about the difficulty of predicting a juvenile's prospects for rehabilitation. *See* 2015 Iowa Acts ch. 65. One doesn't have to read law review articles to grasp this point. Yet the legislature decided to leave LWOP on the table for *some* first-degree murders committed by juveniles. I do not see a constitutionally adequate basis for setting aside that legislative judgment.

**II. The Sentence in This Case Satisfies the Constitutional Standards Set Forth in *Miller* and *Ragland.***

I now turn to how I would actually decide this case. In addition to a categorical challenge, Sweet has raised an as-applied challenge to his sentence. As I previously explained in *Seats*, when confronted with such a challenge, I believe we are required to perform a substantive, not merely a procedural, review of the juvenile LWOP sentence. *See* 865 N.W.2d at 588–89. Thus, it is not enough for me that the five *Miller–Ragland* factors were covered in the sentencing hearing and in the district court's sentencing order. We also need to make an independent determination whether the case is sufficiently uncommon that a district court, if it so chose, could impose an LWOP sentence.[10] In making this determination, I would conduct an independent de novo review of the overall application of the *Miller–Ragland* factors, while accepting specific underlying fact findings if they are supported by substantial evidence.

---

[10]*Montgomery* confirms this point. It concluded that *Miller* imposes both substantive and procedural limits on when a juvenile homicide offender can be sentenced to LWOP. *See Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734–35, 193 L. Ed. 2d at 620.

*Id.* at 588. In this review, no single *Miller–Ragland* factor is determinative. Instead, we should consider "whether there are sufficient indicia the case is out of the mainstream of juvenile homicide cases that an LWOP sentences is a constitutional option." *Id.* at 589.

Under this approach, district courts are not deprived of sentencing discretion. To put it another way, this approach does not turn appellate courts into sentencing courts. Yet it provides some check on the kinds of cases where LWOP sentences are imposed, a check which I believe is required by *Miller* and our precedents. What I have described resembles what several other state appellate courts have done post-*Miller*. *See id.* at 587–88 (discussing cases from California, Louisiana, and North Carolina).

Here is what the district court found after quoting all the *Miller–Ragland* factors. *See Ragland*, 836 N.W.2d at 115 n.6.

> The Court has analyzed this case based on the above factors. Defendant's chronological age in and of itself is not a significant mitigating factor. Defendant was 17 years and three months old at the time of the murders. Had he been nine months older, the law would have required him to serve life in prison without the possibility of parole.
>
> While Defendant's maturity level at the time of the crimes is debatable, these were not crimes of impetuosity, nor were they crimes that Defendant committed because he failed to appreciate the risks and consequences of his actions. Defendant planned these murders. He researched various methods of killing and consulted with others. When the time came, he took the measured step of wearing ear muffs so as not to damage his own hearing when he fired the assault rifle he used to kill the Sweets.
>
> Defendant's early home environment left something to be desired. He reported being sexually abused by a neighbor and apparently never received treatment for any issues that abuse may have caused. Defendant's mother was unable to care for him and left him with the Sweets. The Sweets raised Defendant as most parents would—including him in family events and holidays, marking milestones with pictures and keepsakes, etc. It is undisputed that Defendant behaved

badly and was often angry with the Sweets, but the Court heard nothing that leads it to believe that Defendant's behavior and anger was caused by anything the Sweets did or the quality of home life they provided. By most accounts, the Sweet household was a stable home; the fact that Defendant rebelled against the authority they tried to exercise, sometimes violently, does not change that fact.

The circumstances of the offenses do not militate in favor of mitigation. As noted above, these were not crimes of passion, nor did they occur in the heat of the moment. Defendant did not murder Richard and Janet Sweet because of familial or peer pressures.

Defendant had no incompetencies that made him unable to deal with police officers, prosecutors or assist in his own defense. He understood his rights when he was apprehended and was able to recite those rights before they were recited to him. Defendant was, at all relevant times, of average to above-average intelligence, and there is nothing in the record that leads the Court to believe that he was unable to assist his attorneys in his own defense.

The last factor the Court must assess is the possibility of rehabilitation. The Court considered the testimony and report of Dr. Stephen Hart [the psychologist called by Sweet as a witness]. In Dr. Hart's view, Defendant's prospects for rehabilitation are "mixed." He did not know whether Defendant was treatable, let alone what treatment might be appropriate. Dr. Hart offered the statistic that 75% of people who engage in "serious delinquency" as adolescents spontaneously desist offending by age 25. The Court was not provided with the actual study, thus leaving it with questions regarding the reliability or even applicability of the data. The Court certainly did not take this data as an indication that a 17-year-old who murdered his grandparents in the fashion Defendant did has a 75% chance of "spontaneously" changing his behavior by age 25. Considering the manner in which Defendant murdered his victims and his demeanor following the murders, the Court believes that "mixed" is an overly-optimistic characterization of the possibility of rehabilitation.

It should be an uncommon, if not rare, case where a juvenile offender is committed to life in prison without the possibility of parole, but if this is not such a case, it is frightening to imagine what might classify as such. After giving due weight to the constitutional considerations, the Court deems this to be a rare case in which such a punishment is warranted.

> In the eyes of the law, Defendant was almost an adult when he murdered his grandparents. He planned the crimes and acted with cool deliberation and an utter lack of humanity. The crimes were horrific—two helpless and unsuspecting victims shot as they sat in their living room, left to be discovered by other family members. Why? Simply because Defendant did not like the parental authority they tried to exercise over him. If Defendant's cold-bloodedness wasn't evident from the crimes themselves, it certainly became so immediately thereafter, when he began to sell his victims' belongings, going so far as to bring a friend into the house to show him a flat screen t.v. just a few feet from the Sweets' bodies.

> Defendant may be young, but that has not stopped him from showing the world who he is. He is extremely dangerous. He is now and will continue to be a threat to society. In this case, the interests of justice and community safety outweigh any mitigating factors under *Miller*. For these reasons, the Court imposes the maximum sentence of life imprisonment without the possibility of parole.

The record fully supports this fact-finding. Unfortunately, the court today determines its own facts, drawing largely on unverified statements made by Sweet or his natural mother to the probation officer. The probation officer appropriately distanced herself from those unverified statements when she prepared the presentence investigation report (PSI).[11] Thus, the probation officer said those matters were "reported" to her without vouching for their accuracy. Regrettably, the majority treats them as conclusively proven, noting that the PSI was "admitted into evidence without objection and without correction or elaboration by either party." I disagree with this approach, which I believe gives insufficient deference to the sentencing judge's first-hand factual determinations.

Starting from this questionable premise, the majority concludes Sweet had an "unstable family life." But the district court found, and the

---

[11]It should be noted the natural mother was not an unbiased observer in that her parental rights were terminated when Sweet was four.

record supports, that although Sweet's early home environment was poor, Sweet did *not* suffer from a lack of family stability once he moved in with his grandparents at the age of four. One can fairly say that Sweet murdered the two people who rescued him.

Furthermore, Sweet's juvenile court officer testified that both grandparents were very involved in Sweet's supervision and repeatedly tried to get help for him. Sweet's psychologist was careful to say that although Sweet had *complained* about his grandfather being abusive, "I just want to make clear I'm not saying that's a fact."

In addition to giving considerable weight to unverified statements made to the PSI preparer, the majority downplays the testimony of Sweet's psychologist, much of what was quite unfavorable to Sweet. Here are excerpts from the psychologist's cross-examination testimony:

Q. You've said that the Defendant is quick to anger; correct? A. Yes.

Q. That he is deceitful, defiant? A. Yes.

Q. Aggressive? A. Yes.

Q. And he has a lack of attachment to people. A. Yes.

Q. That he lacks trust in people. A. Yes.

Q. That he is emotionally disconnected. A. Yes.

Q. That he has no strong feelings of empathy or remorse. A. Correct, yes.

Q. He has an attitude of superiority. A. Yes.

Q. And even today you don't think he begins to appreciate what he's done; correct? A. Correct.

Q. Someone with those types of behavior traits that we just went through, what do you call that when they're an adult? A. If those things persisted past the age of 25, if I had an adult who'd shown those things consistently, then that's the kind of thing we often would call psychopathic or antisocial personality disorder.

Q. And I'm correct in saying that you can't say if he is going to be a psychopath; correct? A. That's exactly right. I can't tell you that he will or he won't.

Q. And you have said in your report that he has not responded to treatment, to any type of treatment, to this point; correct? A. Correct. There's some cognitive aspects of his behaviors. Some of his simple attention has responded to medications but this doesn't—hasn't had a big impact on the other parts of his behavior.

Q. And so it could be just in-born personality traits; correct? A. It could be.

Q. And you also cannot recommend any type of treatment that's likely to improve him. A. That's correct. The ADHD, I would imagine, will continue to be treated by medications, but that's actually only one part of his problems as I've outlined them. I think the attachment issues and the personality issues require other forms of treatment, but we don't have any reliably effective treatment for those things.

Let me now detail what in my view makes this case unusual and authorized the district court, in its discretion, to impose an LWOP sentence. In doing so, I will review the *Miller–Ragland* factors while accepting specific factual findings of the district court if supported by substantial evidence.

First, as noted by the district court, Sweet was over seventeen years old when he killed his grandparents, just nine months short of the age when *Miller–Ragland* would no longer even apply. While there is certainly evidence the defendant often acted impetuously, he did not commit these murders impetuously. Noteworthy is the district court's observation that the defendant "took the measured step of wearing ear muffs so as not to damage his own hearing when he fired the assault rifle he used to kill the Sweets."

Second, as found by the district court, Sweet had the benefit of a stable home once he moved in with his grandparents at the age of four. The district court is right: We should not confuse Sweet's violent

rebellion against his grandparents, which culminated in his decision to murder them, with a poor home environment.

Third, the crime was accurately summarized by the district court as "horrific." The defendant not only murdered his grandfather in cold blood, with whom he did not get along, but his grandmother, with whom he did get along. Sweet had no accomplices. No one encouraged him to do what he did.

Fourth, the defendant's youth did not impair his defense. As the district court found, he was of average to above average intelligence. Some of the vocabulary he used in his allocution supports this finding (e.g., "emotionally," "sociologically," "comprehend," "condolences"). Sweet knew his rights before the police recited them to him. He knew the exact penalty provided by the law for his crimes.

Finally, while no one can say for sure whether this defendant can be rehabilitated, it bodes ill for him that he has traits of an antisocial personality disorder, for which no treatment is available. In fairness, Sweet's psychologist testified that Sweet's prospects for rehabilitation are "mixed" because seventy-five percent of delinquents with antisocial personality characteristics do not develop "life-course-persistent antisocial behavior"; only twenty-five percent do. However, as the district court pointed out, these were overall numbers, not numbers specific to persons who commit a crime like a premeditated double murder of one's grandparents.

To my mind, sharp differences exist between this case and three cases we have recently reviewed—*Ragland*, *State v. Louisell*, 865 N.W.2d

590 (Iowa 2015), and *State v. Querrey*, 871 N.W.2d 126 (Iowa 2015).[12] For all these reasons, I believe an LWOP sentence was a constitutional sentencing option here, and the district court's sentence should be affirmed.

For the reasons stated, I respectfully dissent.

Waterman and Zager, JJ., join this dissent.

---

[12]A quick review of the court of appeals' docket indicates that other juveniles who committed first-degree murder have received non-LWOP sentences post-*Miller*. *See State v. Harris*, No. 14–0394, 2015 WL 576020, at *1 (Iowa Ct. App. Feb. 11, 2015) (life with immediate parole eligibility); *State v. Winfrey*, No. 13–1837, 2014 WL 3940136, at *6 (Iowa Ct. App. Aug. 13, 2014) (life with immediate parole eligibility).

**ZAGER, Justice (dissenting).**

I join in the well-written dissent authored by Justice Mansfield. I would affirm the district court sentence of life without the possibility of parole (LWOP) for Sweet. I write separately to voice my ongoing objection to this court's lack of confidence in our district court judges' ability to make difficult sentencing decisions in the area of juvenile sentencing involving life without parole.

We have now had several opportunities to review the sentencing decisions of our district court judges regarding juvenile homicide offenders and LWOP. *See, e.g., State v. Louisell*, 865 N.W.2d 590, 598–603 (Iowa 2015); *State v. Seats*, 865 N.W.2d 545, 555–57 (Iowa 2015). In each case, our court has refused to uphold the decision of the district court that the juvenile homicide offender was the rare and uncommon case warranting the imposition of LWOP. *See, e.g., Seats*, 865 N.W.2d at 557.

This court has repeatedly demonstrated that, in practice, it is unwilling to uphold any sentence of life without parole for juvenile offenders—indeed, we are not even willing to uphold sentences that are merely the functional equivalent of life without parole. *See, e.g., Seats*, 865 N.W.2d at 555–57 (expanding on the factors that district court judges must weigh in a juvenile homicide offender's sentencing hearing, vacating the sentence of LWOP imposed by the district court, and remanding for resentencing); *State v. Ragland*, 836 N.W.2d 107, 122 (Iowa 2013) (requiring individualized sentencing proceedings per *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), not only for juveniles serving LWOP sentences but also for those serving the "functional equivalent" of LWOP sentences). After establishing in

*Ragland* and *State v. Null* that *Miller* would apply retroactively and require individualized sentencing hearings, and later expanding on the factors the district court must consider in *Seats*, this court is *still* in this case unwilling to uphold an LWOP sentence that resulted from a thorough individualized sentencing hearing. *See Seats*, 865 N.W.2d at 555–57 (outlining the factors the district court must weigh in determining which juveniles should be subject to the "rare and uncommon" sentence of life without parole); *Ragland*, 836 N.W.2d at 117; *State v. Null*, 836 N.W.2d 41, 74 (Iowa 2013) ("[W]e conclude article I, section 17 requires that a district court recognize and apply the core teachings of *Roper* [*v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)], *Graham* [*v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010)], and *Miller* in making sentencing decisions for long prison terms involving juveniles.").

Unfortunately, as highlighted by the dissent in this case, even after a thorough sentencing hearing, and after a thorough and well-reasoned decision by the district court, this court will not support the conclusion that this may be that rare and uncommon circumstance warranting a sentence of LWOP. We have certainly provided sufficient guidance as to what would warrant a sentence of LWOP for juvenile offenders.[13] Of

---

[13]We have instructed our judges to weigh certain factors:

First, the court must start with the Supreme Court's pronouncement that sentencing a juvenile to life in prison without the possibility of parole should be rare and uncommon. Thus, the presumption for any sentencing judge is that the judge should sentence juveniles to life in prison with the possibility of parole for murder unless the other factors require a different sentence.

Second, the sentencing judge must recognize that "children are constitutionally different from adults." We have explained, "The constitutional difference arises from a juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character."

course, the procedural safeguards of an individualized sentencing hearing have been utilized in all cases. However, in our substantive analysis, it now appears that the factors we previously established are so vague, subjective, and uncertain that this court cannot expect the district court to do the impossible—make a judgement as to whether the offender is "irretrievably corrupt" or to find a true "rare and uncommon" case sufficient to justify the imposition of a sentence of life without parole. The answer, of course, is to take away all sentencing discretion from the district court and adopt a categorical rule that juvenile offenders may never be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution. I find the basis for this conclusion troubling on many levels.

---

In sentencing the juvenile offender, the court must take into account any information in the record regarding "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." . . . The sentencing judge should consider these family and home environment vulnerabilities together with the juvenile's lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as mitigating, not aggravating, factors.

Third, the sentencing judge must consider "the circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him." . . .

Finally, the sentencing judge must take into consideration that "[j]uveniles are more capable of change than are adults" and that as a result, "their actions are less likely to be evidence of 'irretrievably depraved character.' " . . . The sentencing judge should only sentence those juveniles to life in prison without the possibility of parole whose crime reflects irreparable corruption.

*Seats*, 865 N.W.2d at 555–56 (citations omitted) (first quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418; then quoting *Null*, 836 N.W.2d at 74; then quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423; then quoting *id.*; and then quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841).

First, we are not asking our district court judges to do the impossible. These are the difficult decisions we expect of our judges and are the type of decisions that they make with distinction on a daily basis. I also agree that it is not enough that the *Miller–Ragland–Null* factors were considered in Sweet's sentencing hearing and that the district court sentencing order discussed and analyzed these factors. We also need to make an independent judgment as to whether the case is sufficiently uncommon that the district court judge, in the exercise of his or her own judgment, could impose an LWOP sentence. This is the function of appellate review. The adoption of this categorical rule not only eliminates the role of the district court in its sentencing obligation, but eliminates any effective appellate review. This sea change in sentencing requires greater analysis than simply relieving district court judges of this "impossible" duty. Mere expediency in sentencing juvenile offenders should not be the standard.

I also do not find persuasive the argument that, since highly trained psychologists cannot predict when a juvenile offender is irreparably corrupt, the decisions of our sentencing courts are speculative because they lack adequate predictive information. It is not for these trained professionals to offer an ultimate opinion on this. And frankly, the district court is free to accept it or reject it in any case. It is just one of the multiple factors that we expect our judges to evaluate when determining an appropriate sentence for a juvenile offender.

Last, with all due respect, I question whether the board of parole is better able to discern whether the juvenile offender is irreparably corrupt after time has passed, and after opportunities for maturation and rehabilitation have been provided. I am not an expert in the parole system, nor do I claim to be. But what I have discerned is that the board

of parole has an extremely busy schedule handling literally hundreds of cases a month. Also, parole decisions may be made for a variety of reasons. Some parole decisions may be the result of a change in the rules or overcrowding. The point is, many parole decisions may be made based on factors unrelated to a consideration of maturity and rehabilitation. Likewise, I am not confident that the department of corrections has or will have the resources available to hire highly trained professionals to provide all of the psychological testing and treatment necessary to offer an informed opinion on whether the offender is now irreparably corrupt. And of course, even if those opinions were offered, the board of parole has the ability to reject the opinions as well. Ultimately, I think the adoption of a categorical rule is an improper delegation of the sentencing duties and responsibilities vested in the judicial branch.

The district court provided Sweet with an appropriate *Miller*-type hearing. After the sentencing hearing, the district court applied the unique facts of this case to the multiple factors we have set out in our caselaw. In a thorough, well-reasoned decision, the district court concluded this was the rare case where an LWOP sentence was appropriate. Having done exactly what we expect of our district court judges, and looking at the entire record independently as we are required to do, I would affirm the sentence of the district court.

Waterman and Mansfield, JJ., join this dissent.